Opinion issued June 26, 2008













     




In The
Court of Appeals
For The
First District of Texas




NO. 01–07–00445–CR




REGINALD A. GLENN, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 177th District Court
Harris County, Texas
Trial Court Cause No. 1101243




MEMORANDUM OPINION

           A jury found appellant, Reginald A. Glenn, guilty of first-degree felony theft
of property valued at over $200,000, for which the trial court assessed punishment at
20 years’ confinement. See Tex. Penal Code Ann. § 31.03(a) (Vernon Supp. 2007). 
          Appellant presents three points of error. In his first and second points,
appellant contends that the evidence is legally and factually insufficient to support his
conviction because it fails to show that he possessed the requisite intent. In his third
point, appellant contends that the trial court demonstrated bias during the punishment
phase of trial, which constituted a violation of appellant’s due process rights.
          We affirm.
Background
          Appellant met Joselyn Diaz (“Jolie”) over the internet and began a long-distance relationship. In January 2006, Jolie moved from Missouri to Houston to live
with appellant. Jolie told appellant that she was the beneficiary of a 15-million-dollar
medical-malpractice settlement and that, although she did not yet have the funds, her
lawyer in Missouri, Charles Leonardo, would soon be sending the funds to her. 
          Appellant quit his job as an architect and began contracting to purchase various
pieces of real and personal property. Between January 28, 2006 and February 17,
2006, appellant contracted to purchase a Lexus for $52,625.16; a BMW for
$96,752.42; a Bentley for $198,155.61; furniture from Noel Furniture in the amount
of $463,042.63, furniture from Cantoni Furniture totaling $49,936.11; furniture from
Star Furniture totaling $62,631.14; a home theater system for $32,844.82; a piano for
$31,597.04; and 59 condominium units for $4,602,000.


 
           On February 11, 2006, appellant and Jolie met with Rosemary Hoyt (“Hoyt”),
a sales representative at McVaugh Custom Homes (“McVaugh”), about purchasing
two luxurious new homes. Appellant contracted for a $729,000 home for himself and
Jolie, and for a $639,000 home for his sister.


 Closing was set for February 17, 2006. 
Appellant told Hoyt that he would be paying for the two homes in cash via a wire
transfer from Jolie’s attorney. Jolie gave Hoyt the attorney’s fax number so that Hoyt
could fax copies of the documents with wiring instructions to him. Hoyt tried to fax
the documents but was unsuccessful because the fax number Jolie had given her
belonged to a convenience store. Appellant and Jolie then took the paperwork to fax
to Jolie’s attorney on their own. 
          Shortly after the failed fax transmissions, Hoyt received a call from Pinnacle
Title Company (“Pinnacle”), the title company McVaugh used to handle its closings,
informing her that the two wire transfers for the two homes had indeed arrived. Hoyt
then informed appellant of the arrival of the funds and, on February 17, 2006,
appellant and Jolie arrived at McVaugh’s office for the closing. 
          Pinnacle was to be represented at closing by its escrow officer, Whitney Essex
(“Essex”). On her way to the closing, Essex realized that she was missing the
documentation of appellant’s wire transfers. Essex called the accounting department
at Pinnacle and asked them to look for two McVaugh wire transfers in the range of
$500,000 and $700,000. According to Essex, the accounting department knew
“exactly what [she] was talking about” and had the two wires sent right over. Essex
had failed, however, to look at the name on the wire transfers—concentrating only
on the total amounts of the transfers. 
          At the closing, Essex showed appellant the two wires and appellant “touched
them and pulled them close to him.” The first wire, which was in the amount of
$794,985.73, was applied to the purchase of appellant’s home. The amount of the
wire was $60,751.46 over the purchase price of the house. The second wire, which
was in the amount of $548,420.84, was insufficient to cover the full purchase price
of the home that appellant had contracted to purchase for his sister. Appellant elected
to receive a refund for both the $60,751.46 overage and the full amount of the second
wire, and to return at a later date to close on his sister’s house. 
          A few days after the closing, appellant went back to Pinnacle and picked up the
two refund checks—one for $60,751.46 and one for $548,420.84. Appellant moved
into his house and opened two bank accounts—one at Encore Bank and one at
Sterling Bank. Appellant then began a series of money transfers and cash
withdrawals that involved converting recently deposited funds into cashier’s checks
and then redepositing the cashier’s checks back into either the Encore or Sterling
account. At one point, Glenn drew three cashier’s checks for $100,000 each out of
the Encore account and redeposited them into the Sterling account. 
          Appellant then continued on his course of spending, including placing a
$100,000 down payment on five luxury high-rise condominiums. On another
occasion, all in the same day, appellant placed contracts on a $486,000 Porsche, a
$37,000 Mercedes Benz, and an $80,000 Land Rover. Appellant also withdrew funds
to pay for a $61,000 Infiniti; dental work; airline tickets; $3,000 in electronics from
Best Buy; $2,000 in jewelry; and $1,000 in furniture. 
          Two to three weeks after the closing, on approximately March 9, 2006,
Pinnacle began bouncing checks in its escrow account. It was discovered that the two
wire transfers—one for $794,985.73 and one for $548,420.84—had been posted
twice in Pinnacle’s accounting records. Essex discovered that the name on the wire
transfers was not that of appellant. The transfers had been posted to the proper
owners of the funds, who were purchasing a 1.3 million dollar home—paying
$794,985.73 down and borrowing $548,420.84 from a lender. However, the same
funds had also been improperly posted to appellant’s account. 
          Essex immediately contacted appellant and requested verification from his
bank that his wire transfers had in fact been sent to Pinnacle. Appellant told Essex
that he would have Jolie’s attorney fax the information to her. The information never
came. Essex informed Pinnacle’s president, Warren King (“King”), of the
discrepancy. 
          King contacted appellant, informed him that Pinnacle had no record of any
money wired on appellant’s behalf, and asserted that King needed verification from
appellant’s bank regarding the transfers. King testified that appellant became “very
hostile” and said that his attorney would take care of the situation. Appellant
promised that Jolie’s attorney, who would be in town the following week, would
resolve the problem. However, Jolie’s attorney never came. King continued to try
to contact appellant, and appellant ceased answering his telephone. 
          Appellant testified that, in his telephone calls with King during the first week
of March, King had accused appellant of stealing the money and had demanded the
return of the house and the money. Appellant stated that he did not have any contact
with Jolie’s attorney and could not provide any documentation regarding the wire
transfers. Appellant also testified that he and Jolie became married in the midst of
these events, on March 13, 2006, and that he genuinely believed the money was his,
as proceeds from his wife’s lawsuit. As such, appellant continued to purchase a
number of items, namely, a piano for $31,000; electronics from Circuit City for
$2,000; $21,000 in furniture; $789 in clothing; and a Volkswagen for $21,000. In
addition, appellant made six cash withdrawals, ranging from $2,000 to $9,000. 
          On March 22, 2006, King filed a notice of lis pendens on appellant’s house to 
protect against a possible resale by appellant before the matter was resolved. In a
letter dated March 29, 2006, King reiterated to appellant that Pinnacle had never
received any funds from appellant, that appellant was “threatening the existence of
[Pinnacle],” and that he was “going to put twenty people out of work.” King pleaded
with appellant to cooperate. On March 30, 2006, King went to the Harris County
District Attorney’s Office and reported the situation. In a letter to appellant dated
April 5, 2006, King demanded the return of the $1,343,406.50 in funds from the wire
transfers and asserted that if payment was not made in full to Pinnacle within 10 days
King would seek criminal prosecution.
          Upon receipt of King’s April 5th letter, appellant telephoned King and asserted
that the mistake was Pinnacle’s problem. Appellant refused to return any of the
money and stated that, as far he was concerned, he had just gotten a “free house.” 
King taped this telephone conversation, unbeknownst to appellant, and the tape was
later admitted into evidence at trial.
 
          King brought the tape to Michael Kelly, an investigator for the Harris County
District Attorney’s office, who took measures to freeze appellant’s account at Encore
Bank. Kelly testified that the account at Sterling Bank had already been depleted. 
Kelly contacted appellant, who gave Kelly the name and telephone number of Jolie’s
attorney in Missouri. Kelly testified that he called the number and that the person
who answered hung up on him. In addition, Kelly’s investigation revealed that there
was not an attorney licensed in the State of Missouri by the name of Charles
Leonardo, or any variation thereof.
          On April 7, 2006, appellant sold his $31,000 piano for $10,000 in cash. Later
that day, appellant was arrested while out shopping with Jolie. The day of appellant’s
arrest was the last time appellant ever saw Jolie. Jolie remains at-large.
          King was only able to recover $370,000 in cash and the house, which he sold
at a loss of $125,000. 
           Sufficiency of the Evidence
          In his first and second points of error, appellant contends that the evidence is
legally and factually insufficient to support his conviction. Specifically, appellant
contends that the evidence fails to show that he possessed the requisite intent to
deprive King of the money from the wire transfers. In addition, appellant contends
that the evidence shows that he was operating under a mistake of fact, namely, that
he thought the money was from the proceeds of his wife’s settlement and was,
therefore, his own.
A.      Standards of Review
          A legal-sufficiency challenge requires us to determine whether, after viewing
the evidence in the light most favorable to the verdict, any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Johnson
v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Parker v. State, 192 S.W.3d 801,
804 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d). Although our analysis
considers all of the evidence presented at trial, we may not re-weigh the evidence and
substitute our judgment for that of the fact-finder. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000). 
          We begin the factual-sufficiency review with the presumption that the evidence
supporting the jury’s verdict is legally sufficient. Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996). In conducting a factual-sufficiency review, we view all
of the evidence in a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim.
App. 1997). We will set the verdict aside only if (1) the evidence is so weak that the
verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great
weight and preponderance of the evidence. Marshall v. State, 210 S.W.3d 618, 625
(Tex. Crim. App. 2006). 
 
          Under the first prong, we cannot conclude that “a conviction is ‘clearly wrong’
or ‘manifestly unjust’ simply because, on the quantum of evidence admitted, [we]
would have voted to acquit had [we] been on the jury.” See Watson v. State, 204
S.W.3d 404, 417 (Tex. Crim. App. 2006). We must accord “due deference” to the
fact finder, who is in the best position to evaluate the credibility and demeanor of
witnesses. Marshall, 210 S.W.3d at 625. Under the second prong, we cannot
“declare that a conflict in the evidence justifies a new trial simply because [we]
disagree[] with the jury’s resolution of that conflict.” Watson, 204 S.W.3d at 417. 
Before ruling that evidence is factually insufficient to support a verdict under the
second prong, we must be able to say, with some objective basis in the record, that
the great weight and preponderance of the evidence contradicts the jury’s verdict. Id.
          In conducting our review, we must address the evidence that appellant claims
most undermines the jury’s verdict. See Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim.
App. 2003). 
B.      Applicable Law
          Texas Penal Code section 31.03 provides, in relevant part, that a person
commits the offense of theft if he “he unlawfully appropriates property with intent to
deprive the owner of property.” See Tex. Penal Code Ann. § 31.03(a). A theft is a
“felony of the first degree if the value of the property stolen is $200,000 or more.” 
Id. § 31.03(e)(7).
          “Appropriate” means, inter alia, “to acquire or otherwise exercise control over
property other than real property.” Id. § 31.01(4)(B). Appropriation is unlawful if
“it is without the owner’s effective consent.” Id. § 31.03(b)(1). A person is an
“owner” if he “has title to the property, possession of the property, whether lawful or
not, or a greater right to possession of the property than the actor.” Tex. Penal Code
Ann. § 1.07(a)(35) (Vernon Supp. 2007). Effective consent “includes consent by a
person legally authorized to act for the owner.” Tex. Penal Code Ann. § 31.01(3). 
Deprive means, inter alia, “to withhold property from the owner permanently or for
so extended a period of time that a major portion of the value or enjoyment of the
property is lost to the owner” or “to dispose of property in a manner that makes
recovery of the property by the owner unlikely.” Id. § 31.01(2)(A), (C). 
          A person acts intentionally with respect to the nature of his conduct or to a
result of his conduct when it is his conscious objective or desire to engage in the
conduct or to cause the result. Tex. Penal Code Ann. § 6.03(a) (Vernon 2003). 
C.      Legal Sufficiency 
          Here, the State was required to prove that appellant committed an “unlawful
appropriation” of the property of King, coupled with an intent to deprive King of that
property. See Tex. Penal Code Ann. § 31.03(a). Appellant does not challenge the
State’s evidence that appellant exercised control over the property at issue (the
funds), that King is the owner of the funds,


 and that King withdrew his consent by
demanding return of the funds. Appellant challenges the sufficiency of the evidence
on the element of “intent to deprive.” Specifically, appellant contends that he
believed that the funds were proceeds from his wife’s lawsuit and were, therefore, his
own.
          Culpability for an offense may be considered upon review of events which
occurred before, during, and after the commission of the offense. Mouton v. State,
923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (citing Godsey
v. State, 719 S.W.2d 578, 571 (Tex. Crim. App. 1986)). The jury may infer intent
from a defendant’s acts, words, or conduct. Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002); McGee v. State, 923 S.W.2d 605, 608 (Tex. App.—Houston [1st
Dist.] 1995, no pet.). 
 
          The record shows that, based on information from Pinnacle, Hoyt informed
appellant that his funds had arrived and, on February 17, 2006, appellant and Jolie
went to McVaugh and met with Essex of Pinnacle to close on the homes. At the
closing, appellant picked up and held the wire transfer documents. Pinnacle applied
the first wire transfer, which was in the amount of $794,985.73, to the purchase of
appellant’s home, and Pinnacle refunded the difference of $60,751.46 to appellant. 
Pinnacle refunded the total amount of the second wire, which was $548,420.84, to
appellant. As of this point in the events at issue, the State does not aver that appellant
deceived Pinnacle or King, or that he fraudulently obtained the funds. 
          Two to three weeks later, however, on approximately March 9, 2006, Pinnacle
began bouncing checks from its escrow account, and it was determined that the wire
transfers had been posted twice. The record shows that the wire transfers do not have
appellant’s name on them. Essex testified that she informed appellant of the mistake
regarding his wire transfer and that appellant would need to provide proof that his
wife’s lawyer did in fact send the wire to Pinnacle. Appellant did not provide any
information. 
          Next, King began contacting appellant and asking for proof of the funds
transferred on appellant’s behalf. King testified that appellant did not cooperate.
King further testified that the situation escalated to the point that he demanded the
return of the home and money, but that appellant became hostile and simply made
bare assertions that Jolie’s attorney had wired the money. King stated that appellant
never provided any information or proof that any money had been transferred on
appellant’s behalf.
          In a letter to appellant, dated March 29, 2006, King wrote, 
I am convinced that you do not understand what happened. We never
got your money. You may have sent it, but we never got it. We paid out
$794,000 that we did not have and it is now threatening the existence of
the company. You are about to put 20 people out of work. If you really
did send the money please have your attorney get the paperwork to us
so that we can trace it.
 
          In a second letter, dated April 5, 2006, King demanded that appellant return the
$1,343,406.50 that was paid out to him in error within 10 days or the “matter may be
referred for criminal prosecution.” 
          In a taped telephone conversation between King and appellant, which was
admitted into evidence, King again reiterated that the money did not belong to
appellant and that appellant must return it immediately. Appellant unequivocally
refused to return the money, asserting that the mistake was Pinnacle’s problem and
declaring that he had gotten a “free house.” From this evidence, the jury could have
reasonably concluded that appellant intended to deprive King of the funds. See
Rowland v. State, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988) (stating that actual
deprivation is not an element of “intent to deprive”; however, evidence of actual
deprivation may constitute evidence of intent to deprive). 
          In addition, the record shows that appellant closed on his home on a Friday and 
immediately requested that Pinnacle refund the overage and provide him with the
funds from the second house, which he picked up the following Monday. Appellant
then promptly engaged in a rapid series of complicated transactions involving
changing the form of the funds from checks to cashiers checks and cash, and
withdrawing and re-depositing the same funds into two accounts. In addition,
appellant expended large sums very rapidly, buying expensive items within days,
sometimes within the period of one day. See Tex. Penal Code Ann. § 31.01(2)(C) 
(providing that “deprive” includes “dispos[ing] of property in a manner that makes
recovery of the property by the owner unlikely”).
          Appellant testified that his spending patterns evidenced the fact that he was
spending his own money as he saw fit. However, appellant was notified that the
money was not his and yet he continued to spend large amounts of funds that King
could not, and did not, recoup. See Rowland, 744 S.W.2d at 612.
          Viewing the evidence in the light most favorable to the verdict, a rational jury
could have reasonably concluded that King withdrew his consent when he learned
that appellant was not the rightful owner of the funds and that appellant’s continued
exercise of control over the funds constituted an “unlawful appropriation.” In
addition, the jury could have reasonably concluded that, by actually depriving King
of the funds at issue and refusing to take steps to begin returning those funds when
notified of the error, appellant intended to deprive the owner, King, of those funds. 
We hold that the evidence is legally sufficient to support the jury’s verdict. See
Johnson, 23 S.W.3d at 7. 
          Mistake of Fact
          Appellant contends that he presented a mistake-of-fact defense, namely, that
he reasonably believed that the funds at issue were rightfully his own, as proceeds
from Jolie’s medical malpractice settlement, and that this belief vitiated his intent to
deprive King of the funds. Appellant contends that no reasonable trier of fact could
have found that appellant’s defense was disproved beyond a reasonable doubt. 
          “It is a defense to prosecution that the actor through mistake formed a
reasonable belief about a matter of fact if his mistaken belief negated the kind of
culpability required for commission of the offense.” Tex. Penal Code Ann.
§ 8.02(a) (Vernon 2003); Williams v. State, 930 S.W.2d 898, 902 (Tex.
App.—Houston [1st Dist.] 1996, pet. ref’d). “‘Reasonable belief’ means a belief that
would be held by an ordinary and prudent man in the same circumstance as the actor.” 
Tex. Penal Code Ann. § 1.07(a)(42). Neither the trial court nor the appellate court
decides whether appellant’s mistaken belief was reasonable; this question is reserved
for the jury. See Granger v. State, 3 S.W.3d 36, 39 (Tex. Crim. App. 1999). The trier
of fact is free to accept or reject defensive evidence. Winkley v. State, 123 S.W.3d
707, 712 (Tex. App.—Austin 2003, no pet.).
          Here, appellant testified that he thought that his wife was to receive a
settlement in a medical malpractice suit in the amount of $15 million. McVaugh’s
representative, Hoyt, testified that she also, initally, believed Jolie’s story to be the
truth. 
          Appellant testified that he moved the funds at issue around rapidly because the
checking accounts were newly opened and vendors would not take his temporary
checks, so he needed cashier’s checks to make purchases; Encore bank was
questioning the pace at which appellant was spending money, which appellant found
offensive; and he had learned that his bank accounts would only be insured by the
government for up to $100,000 and he wished to open multiple accounts to be
protected. 
          Appellant contends that the number of contracts he put down on real and
personal property prior to the purchase of the home from McVaugh further evidences
that he sincerely believed that he had money coming in from Jolie’s lawsuit.
 
          Appellant also testified, however, that, during telephone calls that took place
in early March, King accused appellant of having stolen the money. Appellant failed
to provide any proof that money had been sent to Pinnacle on appellant’s behalf and,
instead, appellant evaded King and continued to spend large amounts of money on
luxury items. Even after King placed a notice of lis pendens on appellant’s house and
sent a letter of demand, appellant continued to evade King and spend the money. The
taped telephone conversation between King and appellant shows that King expressly
notified appellant that the money was not his and demanded the return of the money. 
Appellant unequivocally refused.
           It is the jury’s responsibility to fairly resolve conflicts in evidence, to weigh
evidence, and to draw reasonable inferences from evidence. Threadgill v. State, 146
S.W.3d 654, 663 (Tex. Crim. App. 2004). Here, the jury was free to reject appellant’s
contention that he reasonably believed that the money was his own. See McQueen
v. State, 781 S.W.2d 600, 605 (Tex. Crim. App. 1989). The evidence supporting the
jury’s rejection of appellant’s mistake-of-fact defense is legally sufficient.
D.      Factual Sufficiency
          As discussed in detail above, the State presented evidence that appellant
committed theft of property of a value of over $200,000 when he unlawfully
appropriated funds belonging to King, with intent to deprive King of those funds. See
Tex. Penal Code Ann. § 31.03.
          Appellant specifically challenges the factual sufficiency of the evidence of his
intent to deprive King of the funds. In his brief, appellant outlines the evidence
discussed above and states, without discussion or citations to authority, that this
evidence “does not establish criminal intent.”
          Appellant points to the evidence of the series of purchase contracts and
transactions he executed in January and February, prior to his conversation with King
on March 9, 2006, in which King alerted appellant that the wire transfers did not
belong to appellant and that Pinnacle did not have any record of having received
funds on behalf of appellant. Appellant argues, without citation to authority, that
“[p]laintiffs and lawyers encounter problems everyday with settlement distributions”
and therefore this evidence does not support a conclusion that appellant should have
known that Jolie’s purported settlement never existed. In addition, appellant contends
that the purchases appellant made after his March 9th conversation with King fail to
“prove that [appellant] did not actually believe that his wife was about to receive a
large multi-million dollar medical malpractice settlement.”
          The record supports a conclusion that appellant executed the purchase contracts
in January and February in reliance on the proceeds from Jolie’s lawsuit because
appellant did not have money of his own to complete the transactions. The State
argues, however, that when the funds for all of these transactions never appeared, a
reasonable person in appellant’s shoes would have been led to believe that there was
in fact no lawsuit and no lawyer. Further, the State argues, in light of those wires
never having come through, when appellant learned from King that there was in fact
a problem with the transfer of funds on the house, a reasonable person would not have
held steadfast to a belief that Jolie’s settlement was real and would have stopped
spending money until the problem was resolved. Appellant, on the other hand, asserts
that the mistaken wire only reaffirmed his belief that Jolie’s settlement was real and
the money was rightfully his own. 
          Having viewed all of the evidence in a neutral light, we conclude that the jury
could have reasonably believed that appellant had the requisite intent to deprive King
of his property. We cannot conclude that the evidence is so weak that the verdict is
clearly wrong and manifestly unjust or that the verdict is against the great weight and
preponderance of the evidence. See Marshall, 210 S.W.3d at 625. We hold that the
evidence is factually sufficient to support the jury’s verdict.
          Accordingly, appellant’s first and second points of error are overruled. 
Due Process 
          In his third point of error, appellant contends that the trial court’s comments
during punishment “reflected her bias against him thereby denying him his due
process rights in violation of both the United States and Texas Constitutions.” 
Specifically, appellant argues that the trial court indicated an unwillingness to
consider the full range of punishment.
A.      Standard of Review and Applicable Law
          Due process requires that a trial court be neutral and detached. Gagnon v.
Scarpelli, 411 U.S. 778, 786, 93 S. Ct. 1756, 1762 (1973); Brumit v. State, 206
S.W.3d 639, 645 (Tex. Crim. App. 2006); Jaenicke v. State, 109 S.W.3d 793, 796
(Tex. App.—Houston [1st Dist.] 2003, pet. ref’d). A trial court denies a defendant
due process if it imposes a predetermined punishment or it arbitrarily refuses to
consider the entire range of punishment. Jaenicke, 109 S.W.3d at 796 (quoting
McClenan v. State, 661 S.W.2d 108, 110 (Tex. Crim. App. 1983), overruled in part
on other grounds by DeLeon v. Aguilar, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004)).
In the absence of a clear showing to the contrary, a reviewing court will presume that
the trial court was neutral and detached. See Brumit, 206 S.W.3d at 645; Steadman
v. State, 31 S.W.3d 738, 741–42 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d). 
 
 
 
B.     Due Process Analysis


  
          Appellant contends that the following statement by the trial court during the
punishment phase evidences bias in violation of due process:
          THE COURT:       All right. Mr. Glenn, it is the judgment of this court
that you are guilty in Cause No. 1101243, and this
court is now prepared to sentence you. And I want
to make no mistake, I don’t mince words, we are
here for one reason, and one reason only and it’s not
because of Pinnacle, it’s because of you. If you had
given that money back when you were asked for it,
I would not even know you. I do believe you’re a
conn [sic]. I’m not going to give you probation.
You’re not going to give this money back.
 
Appellant claims that this statement evidences that the trial court “failed to properly
consider the full range of punishment including probation.” 
          The record shows that the trial court heard testimony concerning the economic
damage suffered by King and Pinnacle and the damage to its business reputation. In
addition, the trial court heard evidence of King’s inability to recover a substantial
portion of the funds. Further, the trial court heard testimony by appellant concerning
his finances, which included being $48,000 in arrears in court-ordered child support.
 
          The statement appellant cites does not show that the trial court failed to
consider the full range of punishment. Rather, the statement indicates that the trial
court considered community supervision and ruled it out. See Brumit, 206 S.W.3d
at 645–46. Likewise, the court’s statement does not reveal a predetermined
punishment. Appellant has failed to rebut the presumption of a neutral and detached
trial court. 
          Appellant contends that it was improper for the judge to sentence appellant to
confinement because of a perceived inability to pay, citing Ortega v. State, 860
S.W.2d 561, 567 (Tex. App.—Austin 1993, no pet.). In Ortega, the State failed to
prove by a preponderance of the evidence that appellant intentionally refused to make
the payments he was ordered to make as conditions of community service or failed
to make bona fide efforts to legally acquire the resources to make the payments and
therefore the trial court abused its discretion in revoking probation on this basis. Id.
Appellant asks this court to draw an analogy between the facts of Ortega and the
instant case, whereby a perceived inability to pay restitution cannot be used as a basis
to refuse community supervision. 
          However, this court has held that, in making a determination concerning
whether to place a defendant on community supervision, a trial court may “consider
the entire background of the defendant, including his employment history and
financial resources.” Mayo v. State, 861 S.W.2d 953, 956–57 (Tex. App.—Houston
[1st Dist.] 1993, pet. ref’d) (citing Bearden v. Georgia, 461 U.S. 660, 669–70, 103
S. Ct. 2064, 2071 (1983)).
          Because we presume that the trial court was neutral and unbiased, and there is
no clear evidence to the contrary presented, we cannot conclude that such bias existed
on the record before us. 
          Accordingly, appellant’s third point of error is overruled. 
Conclusion
          We affirm the judgment of the trial court.
                                                                        
 
Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

Do not publish. See Tex. R. App. P. 47.2(b).