IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-043-05






WILBORN H. BRUMIT, Jr., Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SEVENTH COURT OF APPEALS


LUBBOCK COUNTY





 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J.,
Meyers, Price, Johnson, Keasler, Hervey, and Cochran, JJ., joined. Womack,
J., concurred in the judgment.


O P I N I O N 



 Appellant was charged by indictment with aggravated sexual assault. Pursuant to an
open plea agreement, appellant elected to have punishment assessed by the trial court. After
hearing extensive evidence of repeated sexual assaults of appellant's twelve-year-old
daughter, which began when she was five years old, and the repeated sexual assaults of one
of her friends, who was twelve and thirteen at the time, the trial court sentenced appellant to
life imprisonment in the Texas Department of Criminal Justice, Correctional Institutions
Division. 

 On appeal to the Amarillo Court of Appeals, appellant argued for the first time that
"[t]he trial court violated appellant's due process rights under the Fourteenth Amendment to
the U.S. Constitution, and committed fundamental error, by failing to function as an impartial
tribunal for sentencing purposes." Appellant raised the same issue under Article 1 § 19 of
the Texas Constitution. Appellant's contentions are based on the trial court's comments just
before sentencing appellant; to wit, 

 Mr. Brumit, I will explain to you what I am doing and why I am doing
it, because I will never understand what you did or why you did it. You are a
predator, the worst kind of predator. The reason being is that we have to teach
our children today to be careful about people that they come into contact with
for fear that something like this may happen to them. When it happens to a
child, your own child, in your own home, it is just unforgivable. There is no
way that anybody can justify understanding what you did or why. 

 I think it was in 1977 or '76, I was involved in the prosecution of a little
six-year-old black child that was kidnapped in the front of his apartment
complex and was killed after he had been sexually assaulted. That case made
me think that anybody that ever harmed a child should be put to death. 

 When your ex-wife made the comments that she made yesterday, I fully
understood, because I don't think there is anybody, any parent anywhere that
can have any sympathy whatsoever for what you did, and to make your own
daughter contemplate suicide at the age of 12 because she felt that your family
had disowned her as if she had done something wrong.

 Your punishment is going to deter you, and hopefully it will deter
anybody else that might contemplate doing what you did. I have no reason to
understand why the jury did what they did in Collin County. We had a case
two weeks ago where seven or eight people on the panel wanted to give
somebody 20 years for just touching their [step] daughter.

 For that reason, I am going to sentence you to life in the penitentiary,
and hopefully, somebody out there will understand this is wrong. 


 The court of appeals refused to address the merits of appellant's complaints, holding
that appellant had waived them for failure to present them to the trial court, either at the time
of sentencing or in his motion for new trial. See Brumit v. State, No. 07-03-0462-CR (Tex.
App.--Amarillo 2004). Here, and in the court of appeals, appellant concedes that he did not
raise these claims before the trial court. Nevertheless, appellant argues that under our
plurality opinion in Blue v. State, 41 S.W.3d 129 (Tex. Crim. App. 2000), we should reach
the merits of his complaints and, similarly, the court of appeals erred in failing to do so. We
granted review to determine whether "[t]he court of appeals erred by affirming the trial
court's sentence, thereby violating Petitioner's due process rights under the Fourteenth
Amendment to the Constitution of the United States, and Petitioner's rights to due course of
law under the Texas Constitution." We affirm the judgment of the court of appeals. 

 At the hearing on the open plea, appellant was admonished, in relevant part, as
follows: 

The Court: Do you understand an open plea to the Court means there is no plea agreement
between you and your attorney and the State's attorney? Do you understand
that? 

Appellant: Yes, sir.

The Court: It means that you would be pleading guilty here today to the charge of
aggravated sexual assault, and that after the Court heard [sic] testimony next
week on punishment, the Court would make a determination as to the
punishment to be assessed. Do you understand that? 

Appellant: Yes, sir.

The Court: And do you understand that the range of punishment for this offense is five to
99 years or life in the penitentiary, and an optional fine up to $10,000. Do you
understand that? 

Appellant: Yes, sir.

******

The Court: Do you understand, Mr. Brumit, in addition - I told you what the range of
punishment was. Do you understand that whatever sentence you would
receive in this case, you would have to serve at least 50 percent of that
sentence before you became eligible for parole? 

Appellant: Yes, sir.

 

 At the sentencing hearing, the State called both victims, both victims' mothers, and
one victims' father. A Collin County Sheriff's deputy, who took appellant's confession, also
testified. Appellant called his sister to testify in his behalf. Appellant did not testify. 

 M.M.B., appellant's daughter, testified that when she was five years old, appellant
began to digitally penetrate her, usually while she slept. She testified that the pain would
wake her, and she would discover that appellant had his hand under her clothes and his finger
in her vagina. M.M.B. explained that, after this initial assault, appellant continued to
digitally penetrate her about twice a week. When M.M.B. was six years old, she told her
mother about the abuse. When M.M.B.'s mother confronted appellant about the outcry, she
accepted appellant's excuses that the touching was accidental or unintended. After her
mother declined to believe M.M.B., she testified that the abuse made her feel "useless,"
"dirty," and that the sexual assaults were her fault. M.M.B. testified that she did not tell
appellant to stop or otherwise resist. She further testified that she was afraid to resist,
primarily because of appellant's large stature. 

 M.M.B. testified that when she was eight years old, appellant raped her for the first
time. M.M.B. had been sleeping and awoke to find appellant penetrating her vagina with his
penis. M.M.B. explained that the rape was very painful. M.M.B. testified that appellant
raped her this one time while the family lived in Lubbock County, but when the family
moved to Collin County shortly thereafter, he continued to rape her, even though all of the
sexual assaults stopped for about two months after the move. 

 Once in Collin County, appellant raped M.M.B. on two other occasions, and the
digital penetration continued with increased frequency. When M.M.B. was twelve, she made
another outcry to her mother. M.M.B. told her mother that she had packed all of her
belongings and intended to move. M.M.B. explained to her mother that she was leaving
because she had not believed the abuse allegations before. M.M.B. told her mother about the 
abuse that continued after she was six, and her mother decided to pack her bags and leave
also. M.M.B.'s mother took her to a Dallas-area hospital for a rape exam, which M.M.B.
described as painful, emotionally uncomfortable, and that it made her feel "dirty." M.M.B.
and her mother stayed at a hotel until appellant was arrested.

 M.M.B. testified about the after-effects of the abuse. She thought that her brother and
grandmother blamed her for her father's predicament, although they did not say so. She
testified that she saw a therapist to deal with the abuse, but it did not help her. M.M.B. was
later hospitalized for suicidal ideation. She explained that, "I was thinking of different ways
to kill myself to make everybody else's life better, because my brother hated me. He couldn't
even look at me. And I had lost contact with the whole part of my dad's side of the family,
and I just felt like I was doing nobody [sic] any good." M.M.B. had also threatened to take
a "whole bottle of pills." She was prescribed anti-depressant medication, but it did not
relieve her depression, rather, "it just made [her] gain a lot of weight." M.M.B. explained
that the sexual abuse made her feel "worthless," "like ... an ugly duckling," who "wasn't
good enough for anybody or anything, not even myself or my family." M.M.B. described the
negative effects of the abuse on her social life and her relations with men, such as the boys
at school and male teachers. 

 On cross-examination, defense counsel elicited testimony that when M.M.B. visited
appellant in prison, he did not blame her, he told her that he had a sickness, and that he was
sorry for what he had done to her.

 Dana Brumitt, M.M.B.'s mother, testified that she was married to appellant for fifteen
years, but they were now divorced. Dana testified that she and appellant lived in Lubbock
County and had two children, M.M.B. and an older son. The family moved to Collin County
when M.M.B. was eight years old. When M.M.B. was six years old, she told Dana that
appellant was sexually molesting her. Dana testified that when she confronted appellant, he
denied that any abuse occurred. Appellant convinced Dana that some accidental touching
may have taken place when he and the kids were roughhousing or when he was tickling
M.M.B. Dana further questioned appellant about M.M.B.'s allegation that he had rubbed his
erect penis against her while M.M.B. was sleeping in his bed, but appellant insisted that it
was just an accident and no contact was intended. Appellant told Dana that M.M.B. must
have "misunderstood" their roughhousing to be sexual or that she was lying altogether. Dana
testified that she had been married to appellant for about ten years at the time of the first
outcry and that she believed appellant's excuses because she had trusted him implicitly. 
Dana testified that, despite her acceptance of appellant's story, she noticed some changed
behavior when M.M.B. started first grade. Specifically, M.M.B. went from being a carefree,
fun-loving child to a more introverted child, who went to the school nurse a lot and who
gained a lot of weight in a short period of time. 

 Dana testified that she had always been the primary bread-winner for the family. 
Dana stated that she had always worked long hours outside the home, but when M.M.B.
turned eight years old and the family moved to Collin County, Dana's schedule got more
demanding, requiring her to be gone from the home during the week days, on some evenings,
and for about eight hours every weekend. Dana testified that when M.M.B. was twelve years
old, she called Dana at work and told her about the sexual assaults. Dana explained that
M.M.B. said that she had packed fourteen suitcases and was leaving. Dana went home,
packed her own bag, and took M.M.B. to a hospital for a rape exam. On the way to the
hospital, Dana called appellant and told him about M.M.B's allegations. Appellant admitted
to the abuse and "just cried." After appellant was arrested, Dana telephoned the other
victim's mother, and when she questioned her daughter, L.C, she said that appellant had been
molesting her, too, over the course of two years. 

 L.C., who was fifteen years old at the time of her testimony, testified that when she
was twelve and thirteen years old, appellant repeatedly sexually assaulted her. L.C. testified
that she was M.M.B.'s best friend, and she spent a lot of time at M.M.B.'s house. L.C. stated
that she was very close to appellant and considered him as a "dad." L.C. frequently sat on
appellant's lap, sometimes with a blanket over them. During these times, appellant would
digitally penetrate her vagina or put her hand down his pants and would make her "go up and
down" on his penis until he "would cum." L.C. estimated that she had been digitally
penetrated more than thirty times. L.C. further testified that appellant raped her on at least
three occasions, he fondled her breasts, and he also asked her to give him a "blow job." L.C.
testified that, at the time, she thought the abuse was her fault; that she has had some
counseling for the abuse, but it has not helped much; that the abuse made her feel "pretty
bad" about herself; that she was embarrassed about it; and that she has gained weight because
of it. 

 L.C.'s mother, Joni Gregg, confirmed that L.C. spent a lot of time at the Brumit's
house. Joni testified that, prior to L.C.'s outcry, Joni had known appellant for twenty years
and trusted him "as a best friend." Joni testified that she felt "betrayed, angry, [and] hurt"
when L.C. told her that appellant had molested her. Joni testified that L.C. has become
"very cautious" about who she associates with since the abuse. 

 On cross-examination, defense counsel elicited testimony about appellant's trial in
Collin County; that appellant pleaded guilty, and that punishment was assessed by a jury. 
Defense counsel asked Joni if it made her feel any better that appellant had pleaded guilty
and Joni said that it did. On redirect examination, the State asked Joni whether "a Defendant
should get leniency because he has admitted to what he has done," and Joni answered, "No." 
The State also elicited testimony that appellant had initially denied sexually assaulting L.C.

 L.C.'s father, testified that L.C. was a quiet respectful child, who looks younger than
her age. He stated that, since the abuse, L.C. had gained weight, that she "overdresses,"
wearing mostly tomboyish clothing, and is quiet and withdrawn.

 Dale Ingram, a Collin County Sheriff's Deputy, testified about taking a video-taped
confession from appellant. Deputy Ingram testified that when he first talked to appellant, he
denied any sexual abuse history as a child. Deputy Ingram stated that appellant admitted to
digital penetration of M.M.B. in Collin County, but he said nothing about the rapes or the
sexual abuse of L.C. On redirect examination, Deputy Ingram concluded that appellant did
not tell the whole truth and was deceitful in his omission of relevant facts.

 Defense counsel called appellant's sister, Pam Brasher. She testified that there was
a family history of child sexual abuse, and she once witnessed her father sexually molest
appellant when he was three years old. Pam testified that she believed that the sexual abuse
of appellant stopped when Pam was ten years old because her father then started molesting
her instead.

 At the close of the evidence, the trial court noted that he had requested a pre-sentence
report from the probation office the week before . A document included in the clerk's record,
prepared by the State's attorney, reflects that, prior to the instant case, appellant had received
"six (6) convictions for aggravated sexual assault regarding child victims." 

Preservation of Error

 The court of appeals declined to reach the merits of appellant's complaint because
appellant failed to object in the trial court. Appellant relies on holdings from the United
States Supreme Court and Texas courts in arguing that the comments by the trial judge here
constitute fundamental error, relieving appellant of the requirement to object below. See
Blue, supra; Marin v. State, 851 S.W.2d 275, 278 (Tex. Crim. App. 1993); United States v.
Olano, 507 U.S. 725, 735-36 (1996) (applying federal procedural rules); United States v.
Williams, 272 F.3d 845, 854-55 (7th Cir. 2001); United States v. Reveles, 190 F.3d 678, 683
(5th Cir. 1999); Nose v. Attorney General of the United States, 993 F.2d 75 (5th Cir. 1993). 
However, when deciding whether a Texas appellate court may address unassigned error, the
applicable test is set forth in Marin v. State. (1) See also Tex. R. App. P. 33.1. 

 In Marin, we said that "our system may be thought to contain rules of three distinct
kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which must be
implemented by the system unless expressly waived; and (3) rights of litigants which are to
be implemented upon request." 851 S.W.2d 275 (Tex. Crim. App. 1993); Garcia v. State,
149 S.W.3d 135, 144 (Tex. Crim. App. 2004). We need not decide today whether an
objection below is required to preserve an error of this nature on appeal because the record
here does not reflect partiality of the trial court or that a predetermined sentence was
imposed. 

Holdings

 Due process requires a neutral and detached hearing body or officer. Gagnon v.
Scarpelli, 411 U.S. 778, 786 (1973). Absent a clear showing of bias, a trial court's actions
will be presumed to have been correct. Thompson v. State, 641 S.W.2d 920, 921 (Tex. Crim.
App. 1982). The comments of the trial court here do not reflect bias, partiality, or that the
trial judge did not consider the full range of punishment. Furthermore, the comments are
clearly distinguishable from those cases where appellate courts have found either partiality
of the trial judge or that the trial judge imposed a predetermined sentence. 

 In Jefferson v. State, the court of appeals reversed the sentence of the trial court where
the trial court told the defendant upon deferring his sentence that, if he violated his probation,
the maximum sentence would be imposed. 803 S.W.2d 470, 471 (Tex. App.--Dallas 1991,
pet. ref'd). Subsequently, the State filed a motion to adjudicate for failure to pay fees and
failure to report. Id. at 470. The trial court noted his previous warning and refreshed
Jefferson's memory about the court's promise to give him the maximum sentence if he
violated his probation. The court of appeals reasoned that Jefferson was denied due process
of law because the trial court's action effectively excluded evidence relevant to punishment,
it precluded consideration of the full range of punishment prescribed by law, and it deprived
Jefferson of a fair and impartial tribunal at the punishment hearing. Id. at 472 (citing
dissenting opinion of Fielding v. State, 719 S.W.2d 361, 368 (Tex. App.-- Dallas 1986, pet.
ref'd)). 

 In Earley v. State, 855 S.W.2d 260, 262 (Tex. App.--Corpus Christi 1993, pet. dis'd),
the trial court (2) warned Earley that the maximum punishment may be later imposed if he
violated the terms of his probation. According to the court of appeals, this fact, standing
alone, was insufficient to conclude that the trial court had imposed a predetermined sentence. 
Upon sentencing, however, the trial court lamented that it was unable to impose a greater
punishment. The court of appeals concluded that this comment, in combination with the trial
court's previous comments, showed that the trial court had "effectively decided the cases
before listening to the evidence." Id. at 262-63. 

 There are several key distinctions between the present case and Jefferson and Earley. 
First, the comments in those cases indicate bias and that the trial judge had not considered
a lower sentence within the range of punishment. Second, in both cases, it was evident that
the trial court did not consider any evidence when imposing its sentence. Here, the trial court
heard extensive evidence of repeated sexual abuse of two children. The trial court listened
to testimony about the effects of the abuse on the victims and their families, and according
to his comments, the trial court was particularly impacted by M.M.B.'s thoughts of suicide. 
The trial court was aware also that this was appellant's seventh conviction for child sexual
assault. It was only after hearing all of this evidence that the trial court made his statement.
And, there is explicit evidence from the hearing on the plea that the trial court considered the
full range of punishment in assessing the sentence. We therefore conclude that the trial court
did not err, and we affirm the judgments below. (3)

DELIVERED: JUNE 14, 2006.

PUBLISH 
1. Federal cases are merely instructive on this procedural issue; therefore, we will not
discuss or consider the cases appellant cites. 
2. The same trial judge sentenced both Jefferson and Earley.
3. Appellant provides us with no argument or authority that the trial court's comments
violate the due course of law provision under the Texas Constitution. See Tex. Const. art. 1 §
19. Therefore, he has waived this complaint, and we will not address it. See Russeau v. State,
171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (citing Tex. R. App. P. 38.1(h)).