

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00449-CR

BRIAN KEITH JENSEN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

### FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

----------

### MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Brian Keith Jensen appeals his conviction and life sentence for murder. We affirm.

### Factual and Procedural Background

Appellant and Robert Neal Sommer were part of a New Mexico construction crew working on a project in Wichita Falls. During a hiatus, the rest

---

[1]*See* Tex. R. App. P. 47.4.

of the crew returned to New Mexico, while Appellant and Sommer stayed behind, sharing room 446 at the Econo Lodge hotel and enjoying the local nightlife.

Herbert Palmer owned and operated a taxicab in Wichita Falls. Sometime during the afternoon on March 20, 2008, Palmer took Appellant and Sommer to a liquor store on 9th Street and a Walgreens nearby. Later, after Palmer had dropped them off back at the hotel, Appellant hired him again to drop Appellant at the corner of 15th and Austin and wait while Appellant visited a house on the block. After seven or eight minutes, Appellant returned to the cab, and Palmer drove him back to the hotel.

Later still, Palmer was again called to the Econo Lodge; this time to carry Appellant and Sommer to Maximus, a strip club on Seymour Highway. As Appellant climbed out of the front seat into the club parking lot, Palmer noticed the handle of a pistol protruding from Appellant's waistband. He also heard Sommer ask Appellant if the nightclub staff searched patrons at the door for weapons; Appellant assured him that they did not.

Inside the club, Appellant chatted with and bought drinks for a dancer who worked there. She noticed that when Appellant ran out of money, he borrowed more from Sommer.

When Appellant and Sommer decided to leave, they called Palmer, who once more ferried them back to the hotel. Appellant paid him the seven-dollar fare, and Sommer offered to add a tip but had nothing smaller than a hundred dollar bill, for which Palmer had no change.

Around nine or ten o'clock that night, Appellant called Palmer once more to pick him up at the hotel. As Palmer pulled into the parking lot, he saw neither Appellant nor Sommer waiting for him as they usually had, so after waiting for a moment, he walked into the office. There, he was told that the room Appellant and Sommer had rented should be empty since the two had gone. Palmer doubted that, and on the way back to his cab he saw Appellant hailing him from outside his room on the fourth floor. Palmer waited a bit longer in the cab before Appellant came down and climbed in.

Sweating heavily, Appellant started talking, saying that he had just shot his friend in the head and had "hurt him real bad." He borrowed Palmer's cell phone and directed Palmer to return him to the corner of 15th and Austin. Palmer overheard Appellant on the phone reiterate to his boss that he had hurt someone "real bad," and confide "that he was fixing to skip town, that he wouldn't see him anymore."

When they reached the corner of 15th and Austin, Appellant "cussed" Palmer and instructed him that he "didn't hear nothing, didn't see nothing." He then stepped out of the cab and, after pausing long enough at the back of it to worry Palmer, he set off down the street. When Appellant was half a block away, Palmer "took off."

Palmer called his wife and told her what had happened; she advised him to call the police. After a couple of blocks, he spotted Wichita Falls Police Officer Jesse Bartow in a patrol car, flagged him down, and reported that he had just

3

dropped off a man claiming to have shot his friend in the head. Palmer described Appellant and said that he and the other man had been staying at the Econo Lodge in room 446.

Officer Bartow radioed for backup and drove to the hotel. After acquiring a keycard from the manager, he went to room 446 to check on the welfare of the occupant. He knocked on the door to no response. Eventually, he used the keycard and entered the room where he found Sommer's body on the floor between two twin beds, apparently shot and killed. An empty leather wallet chained to Sommer's belt lay on the floor next to his body.

Carl Anthony Flint was in the doorway of his efficiency apartment on 16th Street when he saw Appellant knock at the backdoor of a known drug house nearby. When no one answered, Flint called Appellant over and offered to go find some drugs for him. Appellant gave Flint a hundred dollar bill, which Flint took down the street, returning momentarily with rocks of crack cocaine.

Appellant and Flint promptly consumed the drugs in Flint's apartment. Flint looked up at some point, startled to see that Appellant, sitting next to a small stove Flint used to heat his apartment, had taken out a revolver. Appellant had extracted from it an empty cartridge, which he set on top of Flint's stove.

Flint asked what Appellant was doing with a gun. Appellant was evasive at first, but when Flint pressed him, said, "If somebody's going to shoot me, I'm going to shoot them first." When Flint asked Appellant if he had killed someone, Appellant replied, "I don't know. The bullet went past his head."

4

After they had smoked the crack, Appellant suggested that they go to a strip club. The two decided, however, that the club was closed at that hour, so Appellant suggested they go to Walmart instead. He asked Flint if he wanted anything there. Flint mentioned that he could use a new DVD player; Appellant told him to pick one out. Flint called a cab.

Tom Terry was the night supervisor for the cab company and was handling the company's dispatch that night. The police called him to get in touch with Palmer, who soon joined him and the police at the hotel. There, Palmer described Appellant and all that he had recently seen and heard.

Terry was still at the Econo Lodge when he answered Flint's call requesting a ride to Walmart. Terry felt uneasy picking up Flint near the corner of 16th and Austin when he saw that Flint's companion fit the description Palmer had just given him and the police. After arriving in the Walmart parking lot, Appellant gave Terry a hundred dollar bill and asked him to wait for them while they shopped. Terry moved his cab to a parking space some distance from the front door and, as the two men walked inside, Terry called Palmer, still with the police. Terry told Palmer, "[S]end them over to the Lawrence Road Walmart. I've got the guy that was with you."

Inside the store, Appellant purchased Flint a DVD player, paying for it with another hundred dollar bill.

Officer Robert McCann was dispatched to the Walmart to look for the man described by Palmer. He drove his patrol car through the Walmart parking lot's

5

south entrance at almost the same time that Appellant, followed by Flint, exited the front door. Flint headed toward the cab, waving for Terry to wait, but Terry eased the cab out the north entrance before returning through the south, and pulling alongside the patrol car. Terry told Officer McCann that he had just dropped off the person he believed the officer was looking for.

Officer McCann saw a man matching the description given by Palmer walking toward the parking lot exit. After double-checking the description with dispatch and quickly having it confirmed, he exited his patrol car, withdrew his duty weapon, and addressed Appellant, who had seen him coming and was walking away from him toward the exit.

When Appellant appeared to ignore him, Officer McCann raised his weapon and aimed it, announced himself as a police officer, and ordered Appellant to the ground. Appellant complied, and Officer David Raines, having just arrived, rushed in and handcuffed him.

Officer Raines asked if Appellant had any weapons, and Appellant replied that he had a gun in the front of his pants. Officer Raines rolled Appellant over and seized a .38 caliber revolver. Live rounds filled five of the weapon's six chambers; one chamber was empty. The officers placed Appellant in the patrol car for transport to the station for questioning.

The judge who later presided over Appellant's trial issued a warrant to photograph and fingerprint Appellant, to swab his hands for blood and gunshot residue, and to obtain a sample of his DNA.

There was blood on Appellant's hands. There was also blood on the revolver the police seized from him; DNA analysis determined that it was Sommer's blood. Appellant's and Sommer's hands tested positive for gunshot residue.

The medical examiner who performed an autopsy on Sommer opined that a gash on Sommer's forehead could have been caused by a grazing gunshot wound or a blow with a blunt object. The medical examiner determined that the cause of Sommer's death was blunt trauma to the head and brain consistent with his having been pistol-whipped.

The grand jury indicted Appellant for Sommer's murder. Appellant filed a pre-trial motion to suppress all evidence seized after his arrest. After an evidentiary hearing, the trial court noted that the revolver had been seized during a *Terry* search,[2] and found that probable cause coupled with exigent circumstances justified Appellant's arrest without a warrant, and denied the motion to suppress.

Appellant did not testify during either the guilt-innocence or punishment phases of his trial. At the close of the guilt-innocence phase, the jury found him guilty.

Previously, another jury, after considering a severed charge of felon-in-possession-of-a-firearm, which had arisen from Appellant's having the revolver in

[2]*See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

7

the Walmart parking lot, convicted Appellant of that offense and, after finding that Appellant had been convicted of two prior felonies, assessed an enhanced sentence of ninety-nine years' confinement. That case was affirmed on direct appeal by the Amarillo Court of Appeals. *Jensen v. State*, No. 07-10-00028-CR, 2011 WL 691237, at *4 (Tex. App.—Amarillo Feb. 28, 2011, pet. ref'd) (mem. op. not designated for publication).

In the case now before us, Appellant elected for the trial court to assess punishment. Appellant and the State stipulated that Appellant had an extensive criminal record in three states, including convictions for mayhem, assault on a police officer, assault with intent to rob, aggravated assault, attempted aggravated assault with a deadly weapon, carrying a weapon while committing an act of violence, aggravated fleeing a law enforcement officer, and escape.

Appellant pleaded true to three enhancement paragraphs set out in the indictment. After hearing the evidence and arguments of counsel presented during both phases of trial, the trial court found the enhancement allegations true. The record shows that the trial court then announced that, after considering the evidence and arguments of counsel submitted during both phases of trial, it was ready to sentence Appellant. It addressed Appellant as follows:

> THE COURT: I guess that wonders never cease—you see something every day or new just about every day as a judge, as an individual or—or whatever, but one thing I did not see from the Defendant during any stage of this trial whatsoever was any hint of remorse for the crime of which he's been convicted.

8

Mr. Jensen left—you left a dead or dying man with the victim's money to buy drugs and a CD player for a person you really didn't even know, the blood of your victim still on your—on your hands. You've [led] a life of violence, the violence sending you to prison.

Your first offense when you were but 24 years old and I believe the calculation now would show that you are nearly 62 years old, but it's been a long, long, long life of violence. Alcohol is no excuse.

I hereby sentence you to serve life in prison for the murder of the victim in this matter. With it being my authority under the law, I hereby sentence you—your—your sentence for life in prison is to commence once you have completed your 99 year sentence, which you received in here from a jury last year in September of 2009 for felon in possession of a weapon.

Accordingly, your life sentence will not start running until after you have satisfied and served your 99 year sentence, sir.

You will receive credit for the amount of time served in relation to this charge, but your life of violence on the outside world hopefully is over.

**Comment on Appellant's Apparent Lack of Remorse**

In his first issue, Appellant complains that his trial was fundamentally unfair because the trial court, in deciding punishment, considered Appellant's apparent lack of remorse—which Appellant asserts could only have been shown by his own testimony—and then punished him more severely for exercising his right not to testify. As sole proof of his claim, Appellant offers the trial court's remarks before sentencing, reproduced above, in which the trial court observed that Appellant had not shown "any hint of remorse for the crime." Appellant does not so much argue that these remarks, themselves, are error, but rather that they reveal a "window into the mind of the judge" through which Appellant having

9

peered can tell that the trial court took into account his decision not to testify and unfairly punished him more severely for it.

In response to the State's argument that Appellant did not preserve his claim with an objection at trial, Appellant asserts that the right to a trial conducted by an impartial and fair judge is fundamental, and that it would have been pointless to object at trial because the error was in the judge's own mind, and that the judge hardly could have instructed himself to disregard his own bias.

The court of criminal appeals has not directly answered the question whether the right to a fair trial conducted by an impartial judge requires no objection to preserve a claim about its infringement. *See Marin v. State*, 851 S.W.2d 275, 278–80 (Tex. Crim. App. 1993), o*verruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997). But in *Blue v. State*, a case upon which Appellant relies, five members of the court of criminal appeals held that a trial judge's comments to a venire can amount to error requiring no objection to preserve a claim for appeal. 41 S.W.3d 129, 133 (Tex. Crim. App. 2000) (plurality op.). Although five members of the court in *Blue* agreed that the trial court's comments were so improper that they obviated the need for an objection, the five could not agree on what right those comments actually violated. Four thought the comments tainted the presumption of innocence. *Id.* at 132. One also thought they violated the right to a fair trial. *Id.* at 133–35 (Mansfield, J., concurring). And one thought the remarks violated the right to an impartial judge. *Id.* at 139 (Keasler, J., concurring in the judgment). One did not

10

say what he thought except that he concurred in the judgment. *Id.* at 133 (Meyers,J., concurring). The three dissenters did not think that the comments were structural, absolute, or fundamental error, and they would have held that the claim had not been preserved. *Id.* at 142–44 (Keller, J., dissenting).

*Blue* is not controlling because, for one thing, as demonstrated above, it is a plurality opinion. *See Pearson v. State*, 994 S.W.2d 176, 177 n.3 (Tex. Crim. App. 1999) (noting that plurality opinions are not binding precedent). Moreover, the issue in *Blue* involved a trial court's comments to a *venire* and how those comments affected the ability of the jury that was eventually selected to presume the defendant innocent ~~and/~~or to judge the facts impartially. Here, in contrast, the jury had left the building; it had returned a verdict and been discharged, Appellant having elected for the trial court to assess punishment. The trial court's comments in this case, therefore, could not have prejudiced the jury; *Blue* does not apply.

But even if, for the sake of argument, we accepted Appellant's premise that a trial court—with the jury discharged and dismissed—could make a remark so egregious as to reveal that it was infringing upon a nonforfeitable right, we would still not agree that the remarks in this case opened any "window into the mind" through which we may observe the trial court's internal thought processes in action and determine that the trial court unfairly considered Appellant's decision not to testify as a circumstance against him and punished him more severely as a result.

11

Appellant conceded at oral argument that it was not clear that the trial court's consideration of his lack of remorse caused the trial court to sentence Appellant more severely, or if it did, to what degree. But absent a clear showing to the contrary, reviewing courts presume that the trial courts act fairly and impartially. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006); *Jaenicke v. State*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *Steadman v. State*, 31 S.W.3d 738, 741 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Thus, Appellant bears the burden of making a clear showing that the trial court improperly considered his failure to show remorse—and by extension, his failure to take the stand—in assessing a higher punishment.

Appellant has failed to make a clear showing that the trial court was not neutral and detached. Apart from the trial court's remarks before sentencing, which Appellant concedes were not erroneous themselves, Appellant offers up nothing else from the record—such as arbitrary or clearly erroneous adverse rulings—as evidence that the trial court acted with bias or unfairly. We also note that Appellant points to nothing in the record to suggest that the trial court did not consider the entire range of punishment. Nor does he guide us to anything in the record indicating what punishment the trial court would have assessed had Appellant testified that he was sorry for what he did or had the record otherwise indicated that he felt remorse. For instance, there is no record of a hearing on a motion for new trial through which Appellant could have called the judge to the

12

stand and asked whether he considered the full range of punishment or whether he would have assessed a more lenient sentence had Appellant appeared remorseful.

Asserting that there is no evidence in the record to justify the trial court's inferring a lack of remorse from the Appellant's appearance or conduct during either stage of trial except from his failure to testify, Appellant argues that the trial court violated his right to remain silent by equating Appellant's failure to testify with a failure to show remorse.

We reject the premise urged by Appellant that evidence of remorse (or its absence) can only be shown by the remorseful (or not) defendant taking the stand and testifying. Recently, the court of criminal appeals drew a distinction between a defendant's present-sense lack of remorse during trial and evidence of his lack of remorse as shown by the facts of the case. In *Snowden v. State*, the court held that a comment on the former, in a case where the defendant exercises his right not to testify, is an impermissible comment on the defendant's exercise of that right; while a comment on the latter, if supported by the evidence, is a proper summation of the evidence. 353 S.W.3d 815, 824–25 (Tex. Crim. App. 2011).

A defendant's failure to testify is not a proper topic of comment for either the prosecutor or the trial court. *See, e.g.*, Tex. Code. Crim. Proc. Ann. art. 38.08 (West 2011); *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001); *see also Davis v. U.S.*, 357 F.2d 438, 441 (5th Cir.), *cert. denied*, 385 U.S.

13

927 (1966). Much of the case law involving comments on a defendant's failure to testify involves comments made by prosecutors during closing argument. The analysis in those cases is also useful in determining whether a trial court improperly broached the topic of a defendant's silence.

In *Snowden* the prosecutor argued during summation, "And he [the appellant] doesn't give two hoots about the mother of his baby or his baby because he looks her in the eye and punches her in her 38 week old stomach without remorse, just like he is today." *Id*. at 817 *~~*1~~*. The court of criminal appeals held that the first part of the prosecutor's remark was supported by the record evidence that the defendant intentionally punched his pregnant girlfriend in the stomach, and that it was, therefore, a proper summation of the evidence; but the court of criminal appeals also held that the phrase—"just like he is today"—impermissibly drew attention to the fact that the appellant did not take the stand and testify about his present-sense lack of remorse during the trial itself. *Id.* at 817-18 *~~*5–6~~*. *See also Howard v. State*, 153 S.W.3d 382, 385–86 (Tex. Crim. App. 2004) (holding that State's argument was proper summation of evidence when evidence showed defendant had told officer that he had no remorse), *cert. denied*, 546 U.S. 1214 (2006); *Caldwell v. State*, 818 S.W.2d 790, 800 (Tex. Crim. App. 1991) (holding that comment on defendant's lack of remorse was supported by testimony including the appellant's calm demeanor between the murder and his apprehension and his three-day spree of illicit drug use immediately following the murder), *cert. denied*, 503 U.S. 990 (1992),

14

*overruled on other grounds by Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995); *Oliva v. State*, 942 S.W.2d 727, 734 n.2 (Tex. App.—Houston [14th Dist.] 1997) (holding that witnesses may testify as to the defendant's statements and conduct indicating a lack of remorse), *pet. dism'd*, 991 S.W.2d 803 (Tex. Crim. App. 1998).

Appellant's brief directs us to an opinion from this court, *Hall v. State*, for the proposition that a defendant's personal feeling of remorse can only be shown through the defendant's own testimony. 13 S.W.3d 115, 117 (Tex. App.—Fort Worth 2000), *pet. dism'd*, 46 S.W.3d 264 (Tex. Crim. App. 2001). During jury argument in that case, the prosecutor argued, "Has he ever shown remorse for this? No." *Id.* at 117. This court recognized then, as it does today, that comments referring to a defendant's demeanor at and around the time of the offense are permissible. *Id.* at 118. But in *Hall*, the prosecutor strayed from discussing evidence of the defendant's lack of remorse during and around the time of the offense when she argued that he had never showed remorse, which necessarily referred to his failure to testify. *Id.*

Here, the trial court's comment—"one thing I did not see from the defendant during any stage of this trial [. . .] was any hint of remorse for the crime of which he's been convicted"—taken in isolation, reasonably could be interpreted as a remark on Appellant's apparent present-sense lack of remorse during trial. But the remark immediately precedes the trial court's ticking off evidence of Appellant's actions taken after the killing: "you left a dead or dying

15

man with the victim's money to buy drugs and a CD player for a person you really didn't even know, the blood of your victim still on your—on your hands." This comment is supported by evidence admitted at trial, as it was based on testimony of Appellant's drug use, desire to go to a strip club, and trip to Walmart to buy a DVD player for a man that he hardly knew, all within hours of the murder.

Taken together, the trial court's comments reasonably can be construed to refer to Appellant's present-sense lack of remorse and to evidence of his lack of remorse during and immediately after committing the offense. Because the portion of the comments referring to the latter was supported by evidence presented in trial through witness testimony and did not necessarily refer to Appellant's present-sense lack of remorse at trial, that portion did not refer to Appellant's exercise of his right not to testify, and therefore was not error. However, the portion referring to what the trial court did not see *from the defendant during any stage of this trial*, might have supported a holding of constitutional error had it been objected to. *See Bustamante*, 48 S.W.3d at 764 (noting that a trial judge's or prosecutor's comment on a defendant's failure to testify violates the U.S. and Texas constitutions); *Hall*, 13 S.W.3d at 118–19 (distinguishing between prosecutor's comments regarding lack of remorse shown by facts of the case and lack of remorse shown during trial).

All but the most fundamental rights are forfeited if not insisted upon by the party to whom they belong. *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009). This generally includes constitutional errors. *Curry v. State*, 910

16

S.W.2d 490, 496 & n.2 (Tex. Crim. App. 1995); *see also Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). Appellant concedes he did not object to the trial court's comments but argues that they are proof that his trial was fundamentally unfair.

But even if we assumed that the trial court's comment was error of constitutional dimension, it does not rise further to the level of structural or fundamental error. Appellant has shown us nothing in the record to clearly demonstrate that the trial court was biased or unfair or that it did not consider the full range of punishment. And we refuse to speculate about the thought processes of the trial court by peering through the "window" of an isolated comment. We hold, therefore, that Appellant has failed to meet his burden to prove that he received an unfair trial. *See Brumit*, 206 S.W.3d at 645; *Jaenicke*, 109 S.W.3d at 796–97.

Finally, we hold that the trial court did not punish Appellant more severely for exercising his right not to testify. We have already noted that there is no evidence in the record showing what punishment the trial court would have assessed had it concluded that Appellant was remorseful. Moreover, we point out that Appellant stipulated to having compiled an extensive criminal history across three states before coming to this one and receiving his latest two convictions based upon this incident in Wichita Falls. The first of those Texas convictions was for a felon in possession of a firearm; the jury in that case assessed a punishment of ninety-nine years' confinement. In the case before us,

17

the jury found Appellant guilty of murder. Given the facts of this case and Appellant's long and significant criminal history, we hold that there is no merit to the contention that the trial court punished Appellant more severely for exercising his right not to testify. Accordingly, we overrule Appellant's first issue.

## Motion to Suppress

In his second issue, Appellant contends that the trial court erred by denying his motion to suppress the gun and other evidence because it was seized as part of an illegal arrest. The State responds that the gun was seized as part of only an investigative detention, but, even if construed as an arrest, appellant's arrest was authorized, as was the seizure of the gun and other evidence, under the circumstances.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Shepherd v. State,* 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). In so doing, we view the facts in the light most favorable to the trial court's decision. *Id.* We give almost total deference to a trial court's express or implied determination of historical facts and review *de novo* the trial court's application of the law of search and seizure to those facts. *Id.* We will sustain the admission of the evidence if admission is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

Appellant's issue specifically challenges the trial court's denial of the motion to suppress the handgun found in his possession, as well as trace

18

evidence, fingerprints, and other evidence seized after he was taken into custody.

Appellant raised this issue in his appeal from the severed felon-in-possession-of-a-firearm conviction. *Jensen*, 2011 WL 691237, at *2. We agree with our sister court's reasoning and disposition in that case.

Appellant contends that this evidence "was the product of a warrantless arrest without a lawful and statutory exception" to the warrant requirement. However, the gun was seized very early in the encounter between Appellant and law enforcement. The record shows that, when police came into contact with appellant, the officers were aware that a man had been found dead in room 446 of the Econo Lodge, that another man coming from that room had admitted to a cab driver that he had shot someone, and that Appellant matched the description of the passenger that had been given to the police by the cab driver. On the basis of these facts, the police had reasonable suspicion to detain appellant to investigate a potential crime. *See Davis v. State,* 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880; *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App.

19

2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

Appellant does not dispute the existence of reasonable suspicion; rather, he contends that Officer McCann's ordering Appellant to lie in a prone position while Officer Raines handcuffed Appellant transformed the detention into an arrest. The timing of the gun's discovery is critical to our analysis. The record shows that McCann ordered Appellant to lie prone, that Officer Raines handcuffed Appellant, and Appellant was immediately asked if he possessed a weapon. Appellant then admitted that he had a handgun in the front of his pants. Based on the facts known to the officers, namely that Appellant matched the description of a man who had admitted shooting another man and that a man was found to have been shot and killed, it was reasonable for them to suspect that Appellant was armed and dangerous. Further, it was reasonable for them to handcuff Appellant in order to protect themselves while they determined whether Appellant was armed, and their doing so did not transform his temporary detention into an arrest. *See Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim.

20

App.) (citing *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581 (1989)), *cert. denied*, 522 U.S. 894 (1997). Once the officers discovered the handgun on Appellant in the Walmart parking lot, they had probable cause to arrest him for the offense of unlawfully carrying a weapon committed in the officers' presence. Tex. Penal Code Ann. § 46.02(a) (West Supp. 2010); Tex. Code Crim. Proc. Ann. art. 14.01(b) (West 2005).

Because the evidence was not seized as a result of an illegal arrest, we overrule Appellant's second issue. *See Jensen*, 2011 WL 691237, at *3.

### Requested Self-Defense Instruction

In Appellant's third issue, he claims that the trial court erred by refusing to include in the jury charge his proposed instruction on self-defense and the presumption of reasonableness.

He requested the following instruction:

> You are further instructed that the reasonable belief of the accused that deadly force was immediately necessary is presumed to be reasonable, if the accused knew or had reason to believe that the person against whom the deadly force was used was committing or attempting to commit the offense of murder upon the accused by shooting the accused with a firearm, to wit: a handgun.

Sections 9.31 and 9.32 of the penal code govern. Under those sections, a presumption that a defendant's belief that deadly force is immediately necessary was reasonable applies if (1) the defendant knew or had reason to believe that the person against whom the force was used was committing or attempting to commit murder, (2) did not provoke the person against whom the force was used,

21

and (3) was not otherwise engaged in criminal activity other than certain Class C misdemeanors. *See* Tex. Penal Code Ann. §§ 9.31 (a)(1), 9.32(b)(1)(C), (2), (3) (West 2011).

During the charge conference, the trial court offered to include a charge that tracked these statutes, and the State replied that it would not have any objections to such a charge. Appellant, however, ultimately opted instead to stand on his requested charge, which we have set out above.

Appellant's proposed instruction was incomplete; it omitted the provisions relating to provocation and not otherwise being engaged in criminal activity. This is not a matter of requesting a charge that is not in perfect form. *See, e.g., Stone v. State*, 703 S.W.2d 652, 655 (Tex. Crim. App. 1986). Appellant's requested charge was significantly deficient in that it would have instructed the jury to presume Appellant's belief that deadly force was necessary based on only one out of three elements required to justify the presumption. We hold that the trial court did not err by refusing to include a requested instruction that was more than sixty percent incomplete—particularly when the record shows that the trial court offered to fill in the blanks of Appellant's proposed charge, but that Appellant declined. Because Appellant refused the trial court's offer to include a complete and correct charge on the presumption of reasonableness and persisted in requesting one that was two-thirds incomplete, we overrule Appellant's third issue.

**Conclusion**

Having overruled each of Appellant's issues, we affirm the judgment of the trial court.


LEE GABRIEL
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 16, 2012