

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00598-CV

### IN THE MATTER OF J.A.

From the County Court, Karnes County, Texas
Trial Court No. 16-05-00005 JVK
Honorable Stella Saxon, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Patricia O. Alvarez, Justice
                Irene Rios, Justice
                Beth Watkins, Justice

Delivered and Filed: December 4, 2019

AFFIRMED

J.A. appeals the juvenile court's Second Order Modifying Disposition committing him to the Texas Juvenile Justice Department for an indeterminate unspecified term not to exceed his 19th birthday. The sole issue presented on appeal is whether the juvenile court violated J.A.'s due process rights by ordering him to TJJD without an updated psychological evaluation. J.A. contends that by failing to order the updated psychological evaluation, the trial court refused to consider the full range of punishment or determine his welfare and best interest. We affirm the trial court's order.

## BACKGROUND

On May 26, 2016, the State filed a petition in the underlying cause alleging J.A., who was twelve, engaged in delinquent conduct by committing the offenses of aggravated robbery and

injury to the elderly with bodily injury on May 18, 2016. J.A. filed a stipulation of evidence, admitting to having committed the offenses. The juvenile court adjudicated J.A. delinquent and, on August 8, 2016, placed J.A. on probation for two years in the custody of his mother.

On January 13, 2017, the State filed its first petition to modify disposition alleging J.A. was charged with the offense of assault on October 6, 2016, and failed to attend school on numerous dates in September, October, November, and December of 2016. On February 10, 2017, the trial court signed an order modifying J.A.'s disposition and placing him at the Hector Garza Center, a placement facility.

J.A. was unsuccessfully discharged from the Hector Garza Center in December of 2017.[1] On January 5, 2018, the juvenile court signed an order releasing J.A. from detention to the custody of his uncle. The order placed J.A. on full house arrest and required him to attend boot camp. The order prohibited J.A. from leaving his uncle's residence except to attend school or meet with his juvenile probation officer or unless he was under his uncle's direct supervision.

On April 10, 2018, the State filed its second petition to modify disposition alleging J.A. failed to abide by the rules of the Hector Garza Center resulting in his unsuccessful discharge from the facility and failed to attend school on January 18, 2018, and several dates in February and March of 2018. On April 23, 2018, the juvenile court held a hearing at which J.A. pled true to the allegations. The juvenile court found the allegations to be true and reset the remainder of the modification and disposition hearing. On July 6, 2018, the juvenile court continued the hearing.

At the July 6, 2018 hearing, Melissa Padron, J.A.'s juvenile probation officer, testified J.A. was placed with his uncle after he was discharged from the Hector Garza Center but was returned

---

[1] The State's second petition to modify alleges J.A. was discharged on or about December 14, 2017. A letter from the facility dated December 14, 2017, requests that arrangements be made to discharge J.A. on or before December 26, 2017. The facility's discharge summary shows J.A. was discharged on December 27, 2017.

to detention on May 30, 2018 for persistent misbehavior. Padron stated the decision to release J.A. from detention and place him with this uncle followed a long hearing at which J.A. was told this was his last shot. Padron testified regarding the services probation had offered to J.A. to date which included: (1) referral to boot camp four times; (2) receipt of positive action curriculum four times; (3) referral to ropes program four times; (4) referral to family preservation program eight times; (5) referral to WhyTry program which teaches social and emotional principles to help at-risk kids one time; (6) attendance at Too Good for Drugs curriculum twice; (7) placement at the Hector Garza Center, a nonsecure residential placement facility, for ten months; and (8) MHMR and special education services. Padron also testified J.A.'s prior referrals included: (1) burglary of a habitation when J.A. was ten; (2) burglary of a building and expulsion from alternative school; (3) running away; (4) aggravated robbery and injury to the elderly; and (5) assault and failure to attend school. Copies of the December 14, 2017 discharge letter and the December 27, 2017 discharge summary from the Hector Garza Center were admitted into evidence.

The discharge letter noted J.A. refused to follow directives of staff and take his prescribed medication, engaged in multiple incidents of physical aggression and assaultive behavior towards his peers, and refused to accept how his behaviors will negatively impact his future. The discharge summary noted J.A.'s "continuous problematic behaviors (aggression, assaultive behavior on peer/staff, non-compliance, chronic deviance, gang related behaviors, refusing medical and clinical treatment, engaging in theft) resulted in this unsuccessful discharge." Padron testified the reasons the facility discharged J.A. included minimal effort toward meaningful participation in treatment. Padron stated J.A.'s participation in treatment and avoidance of physical aggression and assaultive behavior would be required regardless of where he was placed in the juvenile system. Padron also stated J.A. was continuing to refuse to take his medication for ADHD while in detention. Padron testified the juvenile probation department was recommending placement at

TJJD, noting the department had tried supervision at home, numerous programs, and placement outside the home; however, J.A. continued to engage in the same behaviors. Padron noted J.A. not only assaulted his peers but also assaulted staff members at the Hector Garza Center requiring him to frequently be restrained with physical holds. Padron further stated J.A. was repeatedly counseled that he was a candidate for TJJD when he was released to his uncle's custody in January of 2018; however, he continued to make poor choices requiring his return to detention. Padron emphasized if J.A. had followed the rules after his release to his uncle's custody in January "we wouldn't be here today."

When questioned about possible placement at a secure facility as opposed to a nonsecure facility like the Hector Garza Center, Padron testified a secure facility would offer the same types of programs and treatment the Hector Garza Center offered. Padron noted J.A. would still be required to change the behaviors that led to his discharge from the nonsecure facility. With regard to the difference between a secure facility and TJJD, Padron noted TJJD provides a more in-depth assessment and has more options in terms of the type of placement that would address J.A.'s needs. Padron explained the facilities have to be willing to accept the juvenile if the juvenile probation department makes a referral whereas a facility has to accept a referral from TJJD and find programs to help the juvenile. Padron further noted TJJD has after-care services and halfway housing that assist juveniles in transitioning when released.

Padron testified she had reached out to three secure facilities. One did not respond. The second responded J.A. was too aggressive for their program. The third tentatively accepted him conditioned on the provision of an updated psychological evaluation. Pardon testified J.A. would be required to follow the same placement rules he failed to follow at the Hector Garza Center.

On cross-examination, Padron testified residents progress through four levels at the Hector Garza Center, and J.A. progressed to the third of the four levels but started regressing around the

time he was informed his mother was incarcerated. Padron agreed the instability of where J.A. would be placed upon release could have affected him. Padron further testified J.A did not exhibit the assaultive behavior at the boot camp he attended after he was released to his uncle's custody, and he progressed to a leadership position.

J.A.'s uncle testified if J.A. was released to his custody, he planned to move to Abilene with his mother, J.A.'s grandmother, who had temporary custody of J.A.'s brothers and sisters after their removal by CPS. J.A.'s grandmother was in the process of obtaining full custody of J.A.'s siblings. On cross-examination, J.A.'s uncle conceded J.A. was placed back in detention after previously being released to his custody. J.A.'s uncle also agreed everyone stressed to J.A. that if he ended up back in detention he would likely be committed to TJJD. In response to the juvenile court's questioning, J.A.s' uncle testified J.A. is not aggressive with his siblings. The juvenile court then questioned J.A.'s uncle about J.A.'s prior referrals, noting J.A.'s first referral when he was ten or eleven was the result of serious antisocial behaviors including "[b]reaking into people's houses, burglarizing people, urinating on people's beds, [and] defecating on somebody's bed." J.A.'s uncle stated he did not know anything about those behaviors. The juvenile court also asked J.A.'s uncle whether he knew the elderly man J.A. was charged with injuring, noting the man was ninety-one years old, and while the man was on the floor and reached to be helped up, J.A. "push[ed] him down and [took] his wallet and [took] his money." J.A.'s uncle responded that the man was a neighbor's father. The juvenile court told J.A.'s uncle it was "looking for a little bit of honesty about how he actually behaves. And I find it hard to believe that someone who could be so aggressive would be so meek and mild when it comes to his own family." J.A.'s uncle responded, "I have no way to answer that."

During closing arguments, the juvenile court asked the State's attorney whether its position was that all placements for J.A. had been exhausted short of TJJD. The State's attorney responded

"all placements similar to what he's already been to" and stressed a secure facility would offer the same services provided by the Hector Garza Center. In response to further questioning by the juvenile court about what behaviors merited J.A. being committed to TJJD, the State's attorney responded J.A. refused to follow rules or change his behaviors and emphasized TJJD would give J.A. "the most intensive rehabilitative services that are available in the state." The State's attorney further noted "it would be up to him how long he stayed there."

At the conclusion of the hearing, the juvenile court stated it had "carefully considered all of the evidence presented" and "listened to all the recommendations of the attorneys, your attorney and the attorney for the State." The juvenile court then announced it was modifying the disposition and ordering J.A. committed to the TJJD. After further discussion regarding J.A.'s right to appeal, the juvenile court wished J.A. good luck, and J.A. responded, "F*** y'all." J.A. appeals.

### STANDARD OF REVIEW

A juvenile court has broad discretion to determine a suitable disposition for a juvenile found to have engaged in delinquent conduct, particularly in proceedings involving modification. *See In re P.E.C.*, 211 S.W.3d 368, 370 (Tex. App.—San Antonio 2006, no pet.); *see also In re J.P.*, 136 S.W.3d 629, 632 (Tex. 2004) (holding trial court's decision to modify juvenile's disposition is reviewed for abuse of discretion); *In re E.K.G.*, 487 S.W.3d 670, 673 (Tex. App.—San Antonio 2016, no pet.) (explaining juvenile courts are vested with an even greater amount of discretion when modifying disposition). A trial court abuses its discretion when it "acts unreasonably or arbitrarily, or without reference to any guiding rules or principles." *In re E.K.G.*, 487 S.W.3d at 673. "Absent an abuse of discretion, a reviewing court will not disturb the juvenile court's disposition or modification of a disposition." *Id.*

**DUE PROCESS RIGHTS**

Due process requires a neutral and detached hearing body or officer who considers the entire range of punishment before imposing a sentence. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014); *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). A trial court violates a defendant's due process rights when it arbitrarily refuses to consider the entire range of punishment or willfully imposes a predetermined sentence. *Grado*, 445 S.W.3d at 739–40. Absent a clear showing of bias, we presume the trial court acted in accordance with the defendant's due process rights. *See Brumit*, 206 S.W.3d at 645. In *Brumit*, the court held that the presumption against bias was not overcome when the record showed the trial court had heard extensive evidence before assessing punishment, there was explicit evidence that the trial court considered the full range of punishment, and the trial court did not make comments indicating consideration of less than the full range of punishment. *See Brumit*, 206 S.W.3d at 645.

Here, the record also reflects the juvenile court heard extensive evidence before determining J.A.'s disposition. Although J.A. contends the juvenile court should not have modified his disposition without an updated psychological evaluation to determine if the secure placement facility would accept him, Padron testified about her concerns with placing J.A. in a secure facility and the advantages to placing him at TJJD. J.A. does not identify any statement or action by the juvenile court that would support a finding that it failed to consider the full range of punishment or ruled in a biased manner. Accordingly, J.A. failed to rebut the presumption that the juvenile court acted properly. Furthermore, the juvenile court's order expressly finds commitment to TJJD is in J.A.'s best interest. For these reasons, we conclude the juvenile court acted within its wide discretion in modifying J.A.'s disposition.

## CONCLUSION

The juvenile court's order is affirmed.

Beth Watkins, Justice