**AFFIRM; and Opinion Filed May 15, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00938-CR

**JAMES RUSSELL NELSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F17-34038-V**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

James Russell Nelson pleaded guilty to aggravated assault with a deadly weapon without an agreement on punishment. The trial court found Nelson guilty and assessed punishment of twelve years' imprisonment. In three issues, Nelson contends the trial court erred by exhibiting bias and acting as an advocate for the State, assessing a greatly disproportionate punishment, and not providing Nelson with his common law right to allocution. We affirm the trial court's judgment.

**Judicial Bias**

In his first issue, Nelson contends his due process rights were violated when the trial court exhibited bias against him and acted as an advocate by asking questions during the proceedings.

Nelson specifically complains the trial court "interrogated" him about taking a firearm to his confrontation with Gerald Edwards, the victim of the assault.

*Relevant Facts*

Edwards testified that he, along with two other men, rented bedrooms in Nelson's house. Two of the bedrooms, including the one rented by Edwards, flooded when it rained. Nelson suggested they attempt to determine the source of the leak by cutting a hole in the sheetrock wall of Edwards' room, wait for it to rain, and then seal any cracks in the concrete with superglue.

Edwards was concerned Nelson would not repair the damage to his room, and the two men argued about whether Nelson would be allowed to cut the hole in the sheetrock wall. Nelson then told Edwards that he had thirty days to move out of the house. Edwards said he would not leave unless Nelson obtained an eviction order through the "legal process." Because Edwards knew the situation was going to "come to a head," he later told Nelson that he could cut a hole in the sheetrock wall.

Edwards testified he came home from work the next day and noticed there were cobwebs on the ceiling of the porch. He got a broom and began sweeping the cobwebs. As he was working, Edwards saw Nelson come around the corner of the house. He then heard Nelson say, "So you're just gonna tear up my house." Edwards heard two gunshot and felt the bullets pass him. As Edwards turned around, Nelson said, "I'm just gonna kill you then." Edwards dropped the broom and ran. Nelson continued to shoot at Edwards, grazing his right arm twice and hitting his left arm.

According to Nelson, Edwards was always angry and "vehement" toward him. Approximately six months before the shooting, Edwards showed Nelson a gun and threatened to shoot him the next time he came into the main part of the house. Edwards also showed Nelson a knife and said that he would cut Nelson.

Nelson testified Edwards yelled at him about the water leak. Nelson went to Edwards' room and saw what appeared to be water leaking from "small, very fine" cracks in the foundation. Edwards said that if Nelson did not fix the room "right now," he was going to move out of the house. Nelson responded, "Good, you got 30 days."

According to Nelson, approximately three days before the shooting, Edwards told him that he could have access to Edwards' room in order to fix the leaks. To be thorough, Nelson also checked the ceilings and the roof of the house and found a hole in the roof of the house. On the day of the shooting, Nelson saw Edwards on the porch "knocking a hole in the ceiling" with the broom and went to confront Edwards about damaging the house. Nelson took his pistol because Edwards had become increasingly violent and threatening toward him.

When he got close to Edwards, Nelson said, "Now you're gonna knock holes in my house." Edwards then yelled at him and charged him with the broom raised. Nelson thought Edwards was going to "beat him to a pulp." Because he had back problems and was afraid he might be crippled in a fight, Nelson shot at Edwards. Edwards dropped the broom and ran between the bushes. To "keep Edwards running," Nelson continued to shoot at him, discharging all seven rounds in the gun. Nelson claimed he was a very good shot and, if he had wanted to kill Edwards, "[Edwards] would have been full of holes."

Nelson testified he was sixty-one years old and had medical problems, including "back problems" and "very bad teeth." He had two prior misdemeanor convictions, but no prior felony convictions. Nelson admitted he told the "probation evaluator" that he typically had two to four drinks a day and had drunk alcohol on the day of the shooting. However, on the day of the shooting, he had only one drink and was sober when he confronted Edwards. Nelson quit drinking alcohol about six months after the shooting, and was willing to undergo treatment for alcohol

abuse. Nelson requested the trial court grant him probation and represented he would comply with any conditions imposed by the trial court.

After both parties finished questioning Nelson, the following exchange occurred:

Trial Court:    You hadn't seen him that day?

Nelson:         No.

Trial Court:    When was the time – the first time that you saw him before that day? In other words, when was the last time that you saw him before that day on the porch?

Nelson:         The Sunday he came out and told me he would allow – allow me access to his room.

Trial Court:    Can you help me understand when that was? If this – I know that this happened on the 20th. When was that Sunday, the 19th, the 18th, the 17th?

Nelson:         Sunday I worked, came home. We – he came out and told me he had – I was off on the Monday and Tuesday.

Trial Court:    Okay. So this –

.Nelson:        So, that Monday I came in the house to, you know – to knock the little hole in the wall and check the floor, the foundation there –

Trial Court:    Let me –

Nelson:         – between the rooms.

Trial Court:    Hold on. How many days before this shooting did you see him?

Nelson:         Sunday, Monday, Tuesday.

Trial Court:    And the shooting was on Tuesday or Wednesday?

Nelson:         I think it was Tuesday.

Trial Court:    All right. You hadn't seen him that day, you hadn't seen him since Sunday, you walk around the side of the house to the front porch and you see him doing what he's doing?

Nelson:         I've been – was watching for him to come home from work –

Trial Court:    All right.

–4–

Nelson: – so I could talk to him about the hole in the roof.

Trial Court: You were just gonna talk to him?

Nelson: That was my intention.

Trial Court: Then why'd you bring a gun to that?

Nelson: 'Cause from the back porch when I walk out of my part of the house, I can see the front porch, and he was standing there poking the hole in the ceiling and sweeping it up, poking the hole and sweeping a little bit.

Trial Court: So you got the gun at that time?

Nelson: I picked up the gun at that time.

Trial Court: And you walked around the house with the – the gun?

Nelson: 'Cause I was gonna confront him about knocking holes in the house, yes.

Trial Court: With a gun?

Nelson: I –

Trial Court: You had it out?

Nelson: I hid it behind my back, sir.

Trial Court: You didn't want him to see it?

Nelson: No.

Trial Court: Bullets were chambered?

Nelson: Yes.

Following this testimony, neither the prosecutor nor Nelson's attorney asked any additional questions. The trial court found Nelson guilty and sentenced him to twelve years' imprisonment.

*Analysis*

Nelson argues the trial court abandoned its neutral status and took up the role of advocate by questioning him after the parties had completed their examination and causing him to discuss

–5–

how he purposefully took a gun when he went to confront Edwards. Nelson did not preserve this complaint through a timely objection in the trial court, but argues the trial court's questions constituted fundamental and structural error that he is permitted to raise for the first time on appeal.

Most appellate complaints must be preserved by timely request for relief in the trial court. TEX. R. APP. P. 33.1(a)(1); *Unkart v. State*, 400 S.W.3d 94, 98 (Tex. Crim. App. 2013). However, there are some exceptions to this rule. *See Marin v. State*, 851 S.W.2d 275, 278–80 (Tex. Crim. App. 1993). The court of criminal appeals has recognized two "relatively small" categories of errors—violations of "rights which are waivable only" and denials of "absolute systemic requirements"—which may be addressed on appeal regardless of whether an objection was made in the trial court. *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002) (citing *Marin*, 851 S.W.2d at 280).

In *Proenza v. State*, 541 S.W.3d 786, 788–89 (Tex. Crim. App. 2017), the appellant argued that certain remarks made by the trial court while examining a witness constituted an improper comment on the weight of the evidence in violation of article 38.05 of the code of criminal procedure.[1] The court of criminal appeals noted the "question of error preservation turns not upon the 'circumstances under which [an error] was raised,' but upon the 'nature' of the error itself," *id.* at 796 (quoting *Ex parte Heilman*, 456 S.W.3d 159, 166 (Tex. Crim. App. 2015)), and that the "right to be tried in a proceeding devoid of improper judicial commentary is at least" a waivable-only right under *Marin*. *Id.* at 801. In light of *Proenza*, we will assume, without deciding, that

---

[1] *See* TEX. CODE CRIM. PROC. ANN. art. 38.05 ("In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceedings previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.").

Nelson was not required to object to the trial judge's questions in order to raise his complaint on appeal.[2]

Due process requires a neutral and detached judge. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). A judge must not (1) have an actual bias against the defendant, (2) have an interest in the outcome of the case, or (3) assume the prosecutor's role. *Avilez v. State*, 333 S.W.3d 661, 673 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also Luu v. State*, 440 S.W.3d 123, 128 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("A judge should not act as an advocate or adversary for any party.").[3] Generally, we will not find a due process violation absent a "clear showing of bias" by the trial court. *Brumit*, 206 S.W.3d at 645.

A "neutral and detached" judge is not synonymous with a silent observer. *Marshall v. State*, 297 S.W.2d 135, 136–37 (Tex. Crim. App. 1956). A trial court is permitted to directly question a witness, including a defendant, when seeking information to clarify a point. *See Brewer v. State*, 572 S.W.2d 719, 721 (Tex. Crim. App. [Panel Op.] 1978); *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.).[4] However, in doing so, the trial court must not go beyond permissible questioning by (1) conveying its opinion of the case to the jury and ultimately influencing their decision, or (2) in the zeal of active participation, becoming an advocate in the adversarial process and losing the neutral and detached role required for the factfinder and judge. *Moreno*, 900 S.W.2d at 359.[5] Because Nelson entered an open plea of guilty

---

[2] *See Seely v. State*, No. 05-17-01149-CR, 2018 WL 5118647, at *2 (Tex. App.—Dallas Oct. 22, 2018, pet. ref'd) (mem. op., not designated for publications).

[3] *See also White v. State*, No. 05-17-00397-CR, 2018 WL 1940515, at *1 (Tex. App.—Dallas Apr. 25, 2018, pet. ref'd) (mem. op., not designated for publication).

[4] *See also White*, 2018 WL 1940515, at *3.

[5] *See also White*, 2018 WL 1940515, at *3.

and requested the trial court assess punishment, there was no danger of the trial court's questions influencing a jury. Therefore, only the second consideration is implicated.

In a bench trial, a trial court has more latitude than in a jury trial to question witnesses to obtain information to assist in the fact-finding process. *See Moreno*, 900 S.W.2d at 359–60 (concluding that, in a bench trial, the trial court may ask questions an advocate might ask in order to assist the fact-finding process); *see also Marshall*, 297 S.W.2d at 136–37 (in bench trial, trial court could question witness in order to obtain a clearer idea of merits of case).[6] Although not favored, even extensive and adversarial questioning by a trial court is permissible in a bench trial so long as the questions are relevant to the issues before the court and court's impartiality is not affected. *See Guin v. State*, 209 S.W.3d 682, 686–87 (Tex. App.—Texarkana 2006, no pet.).[7]

The trial court's questions to Nelson began as an attempt to clarify when certain events occurred. The trial court then asked Nelson why he took the gun when he went to confront Edwards, a question both the prosecutor and Nelson's counsel had already asked. Further, there was no dispute that Nelson had the gun when he went to confront Edwards and fired seven shots at Edwards. Rather, the only dispute was whether Edwards was sweeping cobwebs off the porch or charged Nelson with the broom—an issue that was explored by both Nelson's counsel and the prosecutor and about which the trial court asked no questions.

The trial court, by questioning Nelson, did not demonstrate bias against Nelson or become an advocate for the State. Further, the complained-about questions do not reflect that the trial court became so entangled in the role of an advocate that it lost its ability to remain neutral and detached. *See Brumit*, 206 S.W.3d at 645; *Moreno*, 900 S.W.2d at 359–60. Accordingly, we resolve Nelson's first issue against him.

---

[6] *See also Seely*, 2018 WL 5118647, at *1.

[7] *See also Seely*, 2018 WL 5118647, at *1.

**Grossly Disproportionate Punishment**

In his second issue, Nelson asserts the trial court erred by imposing a grossly disproportionate sentence that violated the Eighth Amendment's prohibition against cruel and unusual punishment. While conceding the offense "was undoubtedly of a very serious nature," Nelson argues the sentence was grossly disproportionate because his "criminal history was otherwise free and clear of any other serious crimes or bad acts"; he had treated Edwards with kindness before the shooting; the State had been willing to offer him probation, but had reneged on its offer; and this Court's jurisprudence reveals a substantial body of case law in which the charge of aggravated assault with a deadly weapon resulted in an imposition of a sentence less than the sentence he received.

The concept of proportionality is embodied in the Eighth Amendment's proscription against cruel and unusual punishment. U.S. CONST. amend. VIII; *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016). However, this is a "narrow principle" that does not require strict proportionality between the crime and the sentence. *Simpson*, 488 S.W.3d at 322 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J. concurring)). Instead, it forbids only those extreme sentences that are so "grossly disproportionate" to the crime as to amount to cruel and unusual punishment. *Id.* (citing *Ewing v. California*, 538 U.S. 11, 23 (2003) (plurality op.)). A sentence is grossly disproportionate to the crime "only in the exceedingly rare or extreme case." *Id.* at 322–23. Generally, punishment assessed within the statutory limits is not excessive, cruel, or unusual. *Id.* at 323.

To determine whether a sentence is grossly disproportionate to a particular defendant's crime, we first consider the severity of the sentence in light of the harm caused or threatened to the victim or victims, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. *Id.* In the rare case in which this threshold comparison leads to an

inference of gross disproportionality, we then compare the defendant's sentence with the sentences of other offenders in Texas and with the sentences imposed for the same crime in other jurisdictions. *Id.* "If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." *Id.*

Here, Edwards and Nelson argued about how to address the water leaking into Edwards' room. While investigating the problem, Nelson discovered a hole in the roof. Nelson waited for Edwards to come home because he wanted to discuss the hole in the roof. Nelson took a loaded gun when he went to confront Edwards. Although there was a dispute about who was the aggressor during the conversation, it was undisputed that Nelson shot at Edwards seven times, hitting him with three of the shots. It was also undisputed that Nelson continued to shoot at Edwards as he ran away.

Nelson was convicted of aggravated assault with a deadly weapon, which is a second-degree felony, and his sentence falls within the statutory range of punishment for that offense. *See* TEX. PENAL CODE ANN. §§ 12.33; 22.02(b). Further, having reviewed the record and considered the harm caused to Edwards, Nelson's culpability, and Nelson's previous, relatively minor, criminal conduct, we cannot conclude this is one of those "rare" cases that lead to the inference that Nelson's sentence was grossly disproportionate to the offense. We, therefore, resolve Nelson's second issue against him.

**Common Law Right to Allocution**

At the conclusion of the plea hearing, the trial court found Nelson guilty of aggravated assault with a deadly weapon and assessed punishment of twelve years' imprisonment. The trial court then asked Nelson's attorney if there was any lawful reason why Nelson should not be formally sentenced. Nelson's attorney responded there was no reason, and the trial court sentenced

–10–

Nelson. In his third issue, Nelson argues he is entitled to a new punishment hearing because the trial court violated his common law right to allocution.

"Allocution" refers to a trial court's inquiry as to whether a criminal defendant wishes to "speak in mitigation of the sentence to be imposed." *Eisen v. State*, 40 S.W.3d 628, 631–32 (Tex. App.—Waco 2001, pet. ref'd); *see also Allocution*, BLACK'S LAW DICTIONARY (10th ed. 2014). Article 42.07 of the code of criminal procedure, which implements a statutory right to allocution, requires the defendant to be asked, before sentence is pronounced, whether "he has anything to say why the sentence should not be pronounced against him." TEX. CODE CRIM. PROC. ANN. art. 42.07. The circumstances where sentence cannot be pronounced are limited to when a defendant (1) has been pardoned, (2) is incompetent to stand trial, or (3) escapes after conviction and before sentencing and another person is brought to sentencing who is not the defendant. *Id.* In addition to this statutory right to allocution, Nelson contends he has a common law right to allocution.

Any common law right of allocution must be preserved by making a timely and specific objection in the trial court and obtaining a ruling. *McClintick v. State*, 508 S.W.2d 616, 618 (Tex. Crim. App. 1974) (op on reh'g) (concluding appellant failed to preserve complaint trial court violated his right to "common law allocution" by failing to object in trial court prior to imposition of sentence); *see also* TEX. R. APP. P. 33.1(a)(1).[8] The preservation requirement "ensures that trial courts are provided an opportunity to correct their own mistakes at the most convenient and appropriate time—when the mistakes are alleged to have been made." *Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002).

Nelson did not object prior to sentencing that he had been denied any right to allocution. *See Landers v. State*, 402 S.W.3d 252, 254 (Tex. Crim. App. 2013) ("An appellant fails to preserve

---

[8] *See also Gale v. State*, No. 05-17-00592-CR, 2018 WL 3434511, at *7 (Tex. App.—Dallas July 17, 2018, pet. ref'd) (mem. op., not designated for publication).

error by failing to object when he had the opportunity.") (quoting *Rickels v. State*, 108 S.W.3d 900, 902 (Tex. Crim. App. 2003)).  Although Nelson raised the complaint in his motion for new trial, "an appellant may raise a sentencing issue in a motion for new trial for the first time only if the appellant did not a have the opportunity to object in the punishment hearing."  *Burt v. State*, 396 S.W.3d 574, 577 n.4 (Tex. Crim. App. 2013) (quoting *Hardeman v. State*, 1 S.W.3d 689, 690 (Tex. Crim. App. 1999)); *see also McClintick*, 508 S.W.2d at 618 (concluding appellant failed to preserve complaint he was denied common law right to allocution because "he did not raise this contention before the trial court prior to the imposition of sentence").  Prior to sentencing, Nelson had the opportunity to object that the trial court had denied him any right to allocution.  Because Nelson did not do so, he failed to preserve the issue for our review.  We resolve Nelson's third issue against him.

We affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

180938F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAMES RUSSELL NELSON, Appellant

No. 05-18-00938-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. F17-34038-V.
Opinion delivered by Justice Molberg,
Justices Myers and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 15th day of May, 2019.