

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00338-CR
No. 02-23-00339-CR
No. 02-23-00340-CR

_____

MARCOS ENRIQUE URDANETA, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court Nos. 1566967, 1566969, 1566970

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Pursuant to a plea bargain, Appellant Marcos Enrique Urdaneta pleaded guilty to three counts of knowingly providing false or incorrect information on an application for a motor-vehicle title. *See* Tex. Transp. Code Ann. § 501.155. In accordance with the terms of the plea bargain, the trial court sentenced Urdaneta to five years' deferred-adjudication community supervision on each count. The State subsequently filed a petition to proceed to adjudication, alleging that Urdaneta had violated his community-supervision conditions by committing indecency with a child. *See* Tex. Penal Code Ann. § 21.11. Urdaneta pleaded not true to the allegations, and the trial court, after conducting a hearing, found that the allegations were true, adjudicated his guilt on the three counts of providing false information, sentenced Urdaneta to ten years' confinement, and ordered the sentences to run concurrently. In four points on appeal, Urdaneta argues that the evidence is insufficient to establish that he committed indecency with a child and that he was deprived of a fair hearing and sentencing. We will affirm in all three cases.

## II. BACKGROUND

### A. The Complainant and Her Medical Conditions, the Invitation by Urdaneta's Wife to the Complainant and the Complainant's Mother to Go to the Lake at Twin Points Park, and the Activities at the Lake

S.P. (Salma)[1]—the complainant in this case—was around fifteen years old at the time of the alleged incident.[2] Salma has spina bifida and hydrocephalus. Those medical conditions impact her ability to walk and use the bathroom. Salma explained that she uses braces to help her walk and that she sometimes cannot control when she goes to the bathroom, necessitating her use of diapers. While Salma spoke of a numbing sensation being part of the problem with her ability to control her going to the bathroom, she clarified that she has sensation in her vagina.

Salma's mother is E.R. (Estella). Prior to the alleged incident, Estella was good friends with Urdaneta's wife, Yadelis.[3] On July 28, 2021, Yadelis invited Estella and Salma to go to the lake at Twin Points Park with her, Urdaneta, and other members of

---

[1] To protect the complainant's anonymity, we use aliases to refer to her and her mother. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2] The record does not reflect Salma's date of birth or her exact age at the time of the alleged incident. She testified, however, that she was seventeen years old at the time of the December 5, 2023 hearing on the State's petition to proceed to adjudication. Accordingly, she was approximately fifteen years old at the time of the July 28, 2021 alleged incident.

[3] Several of Urdaneta's family members, including Yadelis, testified at the hearing. Because most of them share the same last name as Urdaneta, we will refer to the Urdaneta family members by their first names or by their relation to Urdaneta.

the Urdaneta family. Estella and Salma accepted the invitation. Around twelve people were part of the group at the lake with Estella and Salma.[4] Many other people were also at the lake; one witness stated that there were "[a]t least 100" people at the lake apart from the Urdaneta group, while another witness estimated that there were "about 80 to 100 people" at the lake.[5]

The Urdaneta group was at the lake for several hours. The group spent much of the time in the water. At some point during the day, a storm necessitated the group's getting out of the water and congregating under a pavilion rented by the group. After being under the pavilion for around fifteen minutes, Estella and Salma left Twin Points Park. Accounts differ as to what occurred in the water and under the pavilion.

## B. The Alleged Sexual Contact in the Water

Salma indicated that she had been wearing a "sports bra-looking swim top" and "swim shorts" while swimming in the lake. There was conflicting testimony regarding whether Salma had been wearing a diaper when she got into the water. Estella and

[4]Salma said that the group consisted of "[a]bout 10, maybe 11 people." One of Urdaneta's daughters testified that the group consisted of twelve people, listing Urdaneta, Yadelis, two of Urdaneta's daughters, one of the daughter's boyfriends, four of Urdaneta's granddaughters, a three-year-old girl in Yadelis's care, Estella, and Salma.

[5]Three brief videos were admitted into evidence at the hearing. Those videos show the lake—and the many people in and around the lake—during some portions of the day in question. The videos, however, do not show the alleged sexual contact between Urdaneta and Salma.

4

Salma both stated that Salma had not been wearing a diaper when she went into the water.[6] Yadelis, however, testified that Salma had been wearing a diaper in the water and that she had seen Estella fix Salma's swimsuit so that the diaper would not show.[7]

Salma cannot swim; thus, when she got into the water, she used a "doughnut-shaped floaty." While in the water, Salma stayed near Estella, Yadelis, and a three-year-old girl whom Yadelis was caring for. Yadelis testified that she was in the water the entire time that Estella and Salma were in the water and that she was near them during that whole time; Yadelis estimated that Estella and Salma were an "arm's length" away while they were in the water.[8] Both Salma and Estella indicated that the water in the lake was dark, with a person not being able to see the legs of someone standing in the water a few feet away.

There is conflicting testimony regarding whether Urdaneta was near Salma at any point while she was in the water. Salma testified that after she had been in the lake for a while, Urdaneta came up to her and started floating behind her. She also

---

[6]Salma said that she had been wearing a diaper when she arrived at the lake, but she indicated that she had gone to a restroom and had removed it before getting into the water.

[7]One of Urdaneta's granddaughters testified that, after the group had been in the water, she had heard Estella say that she was going to the restroom to change Salma's diaper.

[8]Yadelis initially testified that she had "eyes on [Salma] and [Estella] the entire time [that she] was in the water." She later clarified, "It's not like I had my eyes all the time on [Salma], but we were all close there [in] the same place."

stated that Urdaneta took her floaty and headed toward deeper water. Estella stated that Urdaneta had come near Salma and her at some point while they were in the water and that he had "grabb[ed]" onto Salma's floaty when the water got deeper and Estella had trouble maintaining her footing. Yadelis, on the other hand, testified that Urdaneta never "play[ed]" with Salma in the water or took Salma away to the "deep end." One of Urdaneta's daughters, Yarlin, who claimed to have stayed around seven to ten feet away from Estella and Salma during the entire time they were in the water, stated that she never saw Urdaneta come and take Salma away from Estella or swim with Salma off to the side of the group.[9]

As to what occurred after Urdaneta came up behind her, Salma testified: "I was molested. I was in the floaty, in the doughnut floaty, and, like, not super close to my mom. And she was kind of turned away, talking with [Yadelis]. And [Urdaneta] came behind me and put his hand in the front of my swim shorts." Salma stated that Urdaneta had touched her in the "middle part" of her vagina with his hand. She stated that the contact was under her swimsuit, and she estimated that it had lasted for twenty seconds. She said that she knew that Urdaneta had touched her because he had "pulled on the hair and the lips of [her] vagina." Although Salma stated that she did not immediately look to see who had touched her, she said that she knew that it

---

[9]Yarlin stated that she was looking towards Salma the majority of the time that she was in the water, but she acknowledged that she was not watching Salma the entire time that she was in the water.

was Urdaneta because when she turned around after swimming to Estella, he was the only person in the area behind her.

Estella testified that she noticed that Salma's demeanor had changed at one point in the water. She recounted that she had turned to look at Salma, and Salma had gestured to her. Estella stated that she had gone over to Salma, and Salma had told her that she was not having fun anymore and wanted to leave. Estella said that Urdaneta was close by Salma and was holding on to Salma's floaty when Salma gestured to her.

## C. The Alleged Sexual Contact Under the Pavilion

Around the time of the alleged sexual contact in the water, a siren went off at the lake indicating that swimmers needed to get out of the water due to an impending storm. The Urdaneta group got out of the water and congregated under a pavilion they had rented. They remained under the pavilion for around fifteen minutes.

According to Salma, after getting out of the water, she sat down on a bench under the pavilion and started crying.[10] She stated that Urdaneta had come over and had sat next to her, had put his arm around her, had grabbed her left breast over her clothing, and had kissed her on the forehead. Salma indicated that Urdaneta's hand

---

[10]Yadelis stated that she did not see Salma cry or become emotional. Yadelis indicated that she would have noticed if Salma had been crying or had been acting emotional, noting that Salma was close to her throughout the outing at the lake. Yarlin, Yarlenis, and one of Urdaneta's granddaughters similarly testified that they did not see Salma crying. Estella, however, stated that she noticed that Salma had "tears in her eyes" while under the pavilion.

7

was on her breast for "[t]en seconds maybe" and that he had "squeez[ed]" her "whole breast." Salma said that several members of the group—including Estella and Yadelis—were in the area when this contact was made.

Yadelis testified that she never saw Urdaneta hug Salma. Yarlin also testified that she did not see Urdaneta hug Salma. Yarlenis, another one of Urdaneta's daughters, testified that she believed that Urdaneta had kissed Salma on the forehead when saying goodbye, although Yarlenis explained that such a kiss is a common expression of greeting in her culture. One of Urdaneta's granddaughters, Yvette, testified that she had seen Urdaneta give Salma "a kiss on the cheek" and "a side hug bye" when the group was getting ready to leave. Yvette maintained, however, that Urdaneta had no opportunity to grab Salma's breast during that exchange.

Around five minutes after the alleged sexual contact under the pavilion, Estella and Salma left the park. Urdaneta and Yadelis walked Estella and Salma to Estella's car. According to Yadelis, as they were walking to Estella's car, they discussed coming back to the lake in the near future for the birthday party of one of Urdaneta's daughters. Yadelis testified that both Estella and Salma agreed to come back for the birthday party.[11] When they were in the car, Salma told Estella what Urdaneta had done to her in the water and under the pavilion. The police were notified that same day.

_____

[11]Yarlin similarly testified that she had heard Estella and Salma agree to come back to the lake for the upcoming birthday party.

8

## III. DISCUSSION

### A. Urdaneta's Sufficiency Complaints

In his first point, Urdaneta argues that the evidence is insufficient to prove, by a preponderance of the evidence, that he touched Salma's genitals or breast. In his second point, Urdaneta argues that the evidence is insufficient to prove, by a preponderance of the evidence, that said touching of Salma's genitals or breast was made with the intent to arouse or gratify the sexual desire of any person.

#### 1. Standard of Review

We review a trial court's decision to adjudicate guilt in the same manner we use to review a trial court's decision to revoke community supervision. *Sanders v. State*, No. 02-23-00069-CR, 2023 WL 7399119, at *2 (Tex. App.—Fort Worth Nov. 9, 2023, no pet.) (mem. op., not designated for publication); *see* Tex. Code Crim. Proc. Ann. art. 42A.108(b). We review an order revoking community supervision for an abuse of discretion. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Sanders*, 2023 WL 7399119, at *2. In a revocation proceeding, the State must prove by a preponderance of the evidence that the defendant violated at least one of the terms and conditions of community supervision. *Bryant v. State*, 391 S.W.3d 86, 93 (Tex. Crim. App. 2012); *Rickels*, 202 S.W.3d at 763–64. The trial court is the sole judge of the witnesses' credibility and the weight to be given to their testimony, and we review the evidence in the light most favorable to the trial court's ruling. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *Anguiano v. State*, No. 02-19-00170-CR, 2020

9

WL 479588, at *2 (Tex. App.—Fort Worth Jan. 30, 2020, no pet.) (mem. op., not designated for publication).

### 2. Applicable Law

A person commits the offense of indecency with a child if the person engages in sexual contact with a child younger than seventeen years of age or causes the child to engage in sexual contact. Tex. Penal Code Ann. § 21.11(a)(1). "Sexual contact" includes "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" with "the intent to arouse or gratify the sexual desire of any person." *Id.* § 21.11(c)(1).

The defendant's specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks, and all surrounding circumstances. *Stephenson v. State*, 673 S.W.3d 370, 384 (Tex. App.—Fort Worth 2023, pet. ref'd); *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd). Intent can be inferred from conduct alone; no oral expression of intent or visible evidence of sexual arousal is necessary. *Garner v. State*, No. 02-15-00171-CR, 2016 WL 4247970, at *3 (Tex. App.—Fort Worth Aug. 11, 2016, pet. ref'd) (mem. op., not designated for publication); *Scott*, 202 S.W.3d at 408. Further, a child victim's testimony alone can sufficiently support a conviction for indecency with a child. *Benge v. State*, No. 02-23-00207-CR, 2024 WL 3195086, at *4 (Tex. App.—Fort Worth June 27, 2024, no pet.) (mem. op., not designated for publication); *Boyd v. State*, No. 02-20-

10

00116-CR, 2022 WL 188331, at *4 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op., not designated for publication).

### 3. Analysis

We begin by addressing whether the evidence is sufficient to prove, by a preponderance of the evidence, that Urdaneta touched Salma's genitals and breast.

Here, Salma testified that while she was in the water, Urdaneta came up behind her and "put his hand in the front of [her] swim shorts." She stated that Urdaneta touched the "middle part" of her vagina with his hand under her clothing and that during that touching he "pulled on the hair and lips of [her vagina]." While she stated that she did not immediately look to see who had touched her, she said that she knew it was Urdaneta because when she turned around after swimming to Estella, he was the only person in the area behind her. Salma also testified that Urdaneta had grabbed and "squeez[ed]" her left breast over her clothing while she was sitting under the pavilion. While other witnesses in the Urdaneta group testified that they were nearby Salma when the allegedly inappropriate contact occurred and that they did not see the contact, Salma's testimony alone is sufficient to support a finding that Urdaneta touched her genitals and breast. *See Benge*, 2024 WL 3195086, at *4; *Boyd*, 2022 WL 188331, at *4.

Viewing the evidence in the light most favorable to the trial court's ruling and deferring to the trial court on questions of credibility of the witnesses and the weight to be given their testimony, we hold that the trial court did not abuse its discretion by

11

finding that the State proved, by a preponderance of the evidence, that Urdaneta touched Salma's genitals and breast. *See* Tex. Penal Code Ann. § 21.11(a)(1); *Flores-Castro v. State*, No. 12-16-00334-CR, 2017 WL 4675367, at *6 (Tex. App.—Tyler Aug. 23, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that evidence was sufficient to support appellant's conviction for indecency with a child when complainant testified that appellant had "grabbed and squeezed her breast in the middle of the night"); *Garner*, 2016 WL 4247970, at *4 (holding that evidence was sufficient to support appellant's conviction for indecency with a child when complainant testified that appellant had "touch[ed] her 'bikini top' with his hands"). We overrule Urdaneta's first point.

We now turn to whether the evidence is sufficient to prove, by a preponderance of the evidence, that said touching of Salma's genitals and breast was made with the intent to arouse or gratify the sexual desire of any person.

Here, Salma testified that Urdaneta put his hand underneath her swim shorts and touched the "middle part" of her vagina with his hand while in the water. She estimated that this contact lasted for twenty seconds. She stated that during that contact, Urdaneta "pulled on the hair and the lips of [her] vagina." Salma also stated that Urdaneta grabbed her left breast over her clothing while she was sitting under the pavilion. She estimated that his hand was on her breast for ten seconds, and she indicated that he "squeez[ed]" her "whole breast" during that contact.

12

Viewing the evidence in the light most favorable to the trial court's ruling and deferring to the trial court on questions of credibility of the witnesses and the weight to be given their testimony, we hold that the trial court did not abuse its discretion by finding that the State proved, by a preponderance of the evidence, that Urdaneta's touching of Salma's genitals and breast was made with the intent to arouse or gratify the sexual desire of any person. *See Alvarado v. State*, No. 01-22-00893-CR, 2024 WL 1513849, at *5 (Tex. App.—Houston [1st Dist.] Apr. 9, 2024, no pet.) (mem. op., not designated for publication) (holding that complainant's testimony that appellant had reached under her underwear while she was sleeping and had touched her vagina established his intent to arouse or gratify his sexual desire); *Stephenson*, 673 S.W.3d at 384 ("The indecent conduct alone—[the appellant's] repeatedly grabbing [the complainant's] genitals—was indicative of such intent."); *Corporon v. State*, 586 S.W.3d 550, 562 (Tex. App.—Austin 2019, no pet.) ("[T]he jury could have inferred [the appellant's] sexual intent in touching [the complainant's] genitals from the manner in which he [had] placed his hand underneath her swimsuit, [had] 'cupped' her genital area, and [had] 'pinched' her sexual organ."); *Flores-Castro*, 2017 WL 4675367, at *6 (holding that jury could have reasonably inferred that appellant had acted with intent to arouse or gratify his sexual desire where he "grabbed and squeezed [the complainant's] breast in the middle of the night"); *Fetterolf v. State*, 782 S.W.2d 927, 933 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd) (holding that complainant's testimony—that appellant's hand "circled her breast"—was sufficient evidence that he

13

had touched her with the intent to arouse his sexual desire).  We overrule Urdaneta's second point.[12]

## B.  Urdaneta's Complaints That He Was Denied a Fair Hearing and Sentencing

In his third point, Urdaneta argues that he was deprived of a fair hearing because the trial judge purportedly made a decision about the witnesses' credibility based on extrajudicial knowledge.  In his fourth point, Urdaneta argues that he was deprived of a fair hearing and sentencing because the trial judge allegedly revealed a bias against allegations of sex crimes against children.

### 1.  The Exchanges That Form the Bases of Urdaneta's Complaints

During the hearing, Yarlin indicated that she lived with Urdaneta—along with Yadelis and Urdaneta's granddaughters.  Later, Yarlenis testified that Urdaneta lived

---

[12]Pointing to the concurring and dissenting opinion in *Connell v. State*, 233 S.W.3d 460, 473 (Tex. App.—Fort Worth 2007, no pet.) (Dauphinot, J., concurring and dissenting), Urdaneta argues that Texas courts have improperly expanded the meaning of Section 21.11 of the Texas Penal Code by holding that intent can be inferred from a defendant's conduct alone.  However, our court and numerous other Texas courts have repeatedly held that a defendant's intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct alone.  *See, e.g.*, *Totten v. State*, No. 05-22-01215-CR, 2024 WL 358116, at *3 (Tex. App.—Dallas Jan. 31, 2024, no pet.) (mem. op., not designated for publication); *Carbajal v. State*, No. 10-22-00238-CR, 2023 WL 6158371, at *7 (Tex. App.—Waco Sept. 21, 2023, pet. ref'd) (mem. op., not designated for publication); *Stephenson*, 673 S.W.3d at 384; *Weaver v. State*, No. 02-21-00081-CR, 2022 WL 2978730, at *9 (Tex. App.—Fort Worth July 28, 2022, pet. ref'd) (mem. op., not designated for publication); *Garner*, 2016 WL 4247970, at *3; *Scott*, 202 S.W.3d at 408; *see also McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981) (stating that "the requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks[,] and all surrounding circumstances").  We thus reject Urdaneta's argument.

14

with her and had been doing so for the previous two years. Yarlenis stated that if Yarlin had indicated that Urdaneta was living with Yarlin and his granddaughters, that would not be an accurate statement. Yarlenis also testified that the reason Urdaneta lived with her was because she did not have any children in her home, stating that he had moved in with her because of "the bond conditions."

Later during the hearing, the following exchange occurred between the trial judge and Yarlenis regarding Urdaneta's place of residence:

THE COURT: Is the only reason your dad lives with you . . . because of bond conditions, or did something else happen that they moved out from different homes?

THE WITNESS: Oh, no. No, no, no. My dad would definitely be home if it wasn't for that situation, for sure. Like I said, he's the main provider. My mom doesn't work.

THE COURT: So if the bond conditions weren't there, would he move back home?

THE WITNESS: Definitely.

. . . .

THE COURT: Were you aware that sometime during these two years, he actually was not on these bond conditions?

THE WITNESS: I don't understand that question. I'm sorry.

THE COURT: Okay. If I were to tell you that he wasn't on these bond conditions the entire time over the past two years, would that surprise you?

THE WITNESS: I still don't understand that question. I'm sorry.

15

THE COURT: Okay. Does he have—do you think he has bond conditions that keeps him from living with children?

THE WITNESS: No.

THE COURT: That's not what his bond conditions are? What are his bond conditions?

THE WITNESS: Well, I don't—I'm so sorry. I don't—I'm a little bit confused by the question that you're trying to ask me.

THE COURT: You said he lives with you because of bond—

THE WITNESS: Yes.

THE COURT: —conditions.

THE WITNESS: Yes.

THE COURT: Tell me what your understanding of that situation is.

THE WITNESS: I just know—I believe—I believe it's because he's not allowed to be—I—from what—my understanding, I believe it's because he's not—my little nieces are underage—right?—so that's why he's not supposed to be at home or even contact—contacted by them.

THE COURT: Okay.

THE WITNESS: So that's why he lives with me.

THE COURT: So your belief is the bond conditions are that he's not supposed to be around children?

THE WITNESS: That's from what—my understanding.

THE COURT: That's what I'm asking you.

THE WITNESS: Yeah.

16

THE COURT: Okay. Do you understand that those were not his bond conditions the entire time since two years ago?

THE WITNESS: Yes, sir.

THE COURT: You know there was a break in there where he did not have those bond conditions?

THE WITNESS: Yes, sir.

THE COURT: What happened then? Did he go home?

THE WITNESS: No. No. He definitely stayed—still stayed with me.

THE COURT: Even though the bond conditions were no longer there?

THE WITNESS: Yes, sir. If I'm—if I'm understanding correctly.

THE COURT: Yeah, you're understanding correctly. All right. Any questions based on my questions?

[Urdaneta's Counsel]: No, Judge.

THE COURT: State?

[State's Counsel]: No, Your Honor.

After both sides rested and closed, the trial judge made the following statement

on the record:

All right. Having been considering this the entire time during testimony, having heard the testimony of witnesses, I don't—I don't know who is lying about the—from [Urdaneta's] witnesses, I don't know who is lying about where this guy is actually living. I don't—if he isn't at home, I don't know why one witness would say he is and the others say he's not.

That, on top of, I think—I find that [Salma] is—I found her testimony credible. And I find that [Urdaneta's] violations alleged by the State are true[,] . . . and I'll adjudicate him guilty in all three case numbers of his felony offense[s].

In pronouncing Urdaneta's sentence, the trial judge made the following statement:

All right. Having considered the evidence presented to the [c]ourt, without anything further—I mean, this is the type of evidence that is the types of allegations that I think—well, I'm ruling that the [c]ourt's sentence is the 10 years—10 years on each case, run them together in the Texas Department of Corrections.

## 2. Applicable Law

Due process—as embraced in the federal and Texas constitutions—requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006); *Hill v. State*, No. 05-14-01445-CR, 2016 WL 1554932, at *2 (Tex. App.—Dallas Apr. 14, 2016, no pet.) (mem. op., not designated for publication). While a judge may question a witness to obtain information or clarify a point, the judge must not become an advocate in the adversarial process and lose the neutral and detached role required. *Johnson v. State*, No. 02-21-00094-CR, 2022 WL 2353097, at *3 (Tex. App.—Fort Worth June 30, 2022, pet. ref'd) (mem. op., not designated for publication). To determine whether a judge's bias or prejudice deprived the defendant of due process, we review the entire record. *Id.* at *2; *Tovar v. State*, 619 S.W.3d 783, 792 (Tex. App.—San Antonio 2020, pet. ref'd).

18

Unfavorable rulings alone will not support a claim of bias; generally, neither will remarks of a judge during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases. *Johnson*, 2022 WL 2353097, at *3; *Dunbar v. State*, No. 03-18-00673-CR, 2020 WL 1943356, at *2 (Tex. App.—Austin Apr. 23, 2020, no pet.) (mem. op., not designated for publication). "Judicial remarks may show bias and lack of impartiality 'if they reveal an opinion that derives from an extrajudicial source,' and 'they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.'" *Dunbar*, 2020 WL 1943356, at *2 (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994)). Opinions based upon evidence received in judicial proceedings do not ordinarily raise questions about a judge's impartiality. *Johnson*, 2022 WL 2353097, at *3 (citing *Quinn v. State*, 958 S.W.2d 395, 403 (Tex. Crim. App. 1997)). Absent a clear showing of bias, a trial court's actions are presumed to have been correct. *Brumit*, 206 S.W.3d at 645; *Hill*, 2016 WL 1554932, at *2.

### 3. Analysis

Urdaneta complains about the trial judge's questioning of Yarlenis regarding Urdaneta's place of residence, the trial judge's comments regarding the credibility of the witnesses, and the trial judge's comments upon sentencing. We note that Urdaneta did not object to the trial judge's questioning of Yarlenis or to the trial judge's comments at the hearing. We will assume, without deciding, that Urdaneta need not have objected at the hearing in order to preserve these complaints. *See*

19

*Brumit*, 206 S.W.3d at 644–45 ("We need not decide today whether an objection below is required to preserve an error of this nature on appeal because the record here does not reflect partiality of the trial court or that a predetermined sentence was imposed."); *Johnson*, 2022 WL 2353097, at *2 (declining to address whether appellant preserved his argument that the trial judge engaged in an adversarial cross-examination of a witness when appellant's issue "fail[ed] on the merits"); *Dunbar*, 2020 WL 1943356, at *2 (assuming without deciding that trial judge's comments in probation-revocation proceeding were error for which no objection was required).

As to the trial judge's questioning of Yarlenis regarding Urdaneta's residence, we hold that such questioning does not reveal bias or lack of impartiality. Rather, the trial judge's questions appear to derive from the fact that both Yarlin and Yarlenis testified that Urdaneta was living with them. Such questioning was thus a proper attempt by the trial judge to clear up an inconsistency in the record. *See Johnson*, 2022 WL 2353097, at *5 ("In context, the trial judge's questioning was an attempt at eliciting clarification and elaboration."); *cf. Hill*, 2016 WL 1554932, at *5 (holding that trial judge did not lose her ability to remain neutral and detached based on questions that "reflected the judge's attempts to understand [the appellant's] state of mind and acceptance of responsibility for her actions").

As to the trial judge's statements regarding the credibility of the witnesses, we see nothing improper in the judge's statement that he found Salma's testimony credible and that he did not know "who [was] lying about where [Urdaneta was]

20

actually living." These comments do not display a deep-seated favoritism or antagonism that would make fair judgment impossible; rather, they comport with the factfinder's role to judge the witnesses' credibility and to give weight to their testimony. *See Hacker*, 389 S.W.3d at 865; *see also Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157 ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."). Moreover, we reject Urdaneta's contention that the trial judge's credibility determinations were made based on extra-judicial knowledge; his statement regarding not knowing "who [was] lying about where [Urdaneta was] actually living" was based on the testimony given at the hearing. Such testimony is not an extra-judicial source. *See Hill*, 2016 WL 1554932, at *6 ("Appellant cites us to no authority, and we have found none, to suggest a witness's responses to a trial judge's questions constitute evidence outside the record.").

Finally, as to the trial judge's statement at sentencing, we see nothing to indicate a clear showing of bias or prejudice. The trial judge said, "Having considered the evidence presented to the [c]ourt, without anything further—I mean, this is the type of evidence that is the types of allegations that I think—well, I'm ruling that the [c]ourt's sentence is the 10 years—10 years on each case, run them together." In his brief, Urdaneta offers a conclusory remark that the trial judge's statement

21

demonstrates an "expressed bias against sex crimes against children." We detect no such express bias in the trial judge's statement; accordingly, we presume that the trial judge's actions were correct.[13] *See Brumit*, 206 S.W.3d at 645; *Hill*, 2016 WL 1554932, at *2. We overrule Urdaneta's third and fourth points.

## IV. CONCLUSION

Having overruled Urdaneta's four points, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 3, 2024

---

[13]Moreover, because Urdaneta does not offer a clear and concise argument explaining why the trial court's statement demonstrates an "expressed bias against sex crimes against children," we hold that he has inadequately briefed this point. *See* Tex. R. App. P. 38.1(i).